(No. 62053.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. FRANK REDD, Appellant.

*Opinion filed March 22, 1990.*

MILLER, J., joined by STAMOS, J., specially concurring.

David F. Graham, David B. Johnson, Kathleen L. Roach and Shari S. Diamond, of Chicago (Sidley & Austin, of counsel), for appellant, and Frank Redd, of Menard, appellant *pro se*.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Terence M. Madsen, Assistant State's Attorney, of Chicago, and Thomas V. Gainer, Jr., Kenneth T. McCurry, Bonnie Meyer Sloan, Inge Fryklund and Renée G. Goldfarb, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CALVO delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, Frank Redd, was convicted of the rapes and murders of Aretha and Leola Bea. The same jury which convicted defendant determined defendant was eligible for the death penalty. The jury found no mitigating circumstances sufficient to preclude imposition of the death

penalty and returned a verdict directing that defendant be sentenced to death. The circuit court entered judgment on the verdict and also sentenced defendant to an extended term of imprisonment of 60 years on the two rape convictions. Defendant's post-trial motions were denied, and he brings a direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603). For the reasons expressed in this opinion, we reverse the convictions, vacate the imposed sentences and remand for a new trial.

Two sisters, Leola Bea, three years old, and Aretha Bea, five years old, were raped and murdered in the early morning hours of March 4, 1984. Leola and Aretha lived with their mother, Ruby Bea, and their sister, Robert Terese, at 6712 South Halsted in Chicago.

Ruby Bea and her three children lived on the third floor of the three-floor building. On the first floor was a lounge, which was closed. On the second floor were two apartments: Percy Hamilton lived in the second-floor rear apartment, and Gloria Stewart, her son, Tyrone, and her fiance, Leslie Bea, lived in the second-floor front apartment. Ruby Bea and her three children lived in the third-floor rear apartment; Betty Gray lived in the third-floor front apartment.

Gloria Stewart is defendant's sister. Leslie Bea is Ruby Bea's brother-in-law. Ruby Bea had been paying rent for her third-floor apartment since January 1984. Ruby Bea and her children did not move into the apartment until March 3, 1984. Before that, Ruby and her children lived with Gloria Stewart in her second-floor apartment.

On March 3, Ruby Bea left her children with Mrs. Earceaner Washington at 6950 South Peoria. Mrs. Washington had baby-sat for the children before. Mrs. Washington is the mother of defendant and Gloria Stewart. Defendant was living with his mother at 6950 South Peoria on March 3. It is approximately 2½ blocks from 6950 South Peoria

to 6712 South Halsted. It is a 5- to 10-minute walk between the two apartment buildings.

At approximately 9 or 10 p.m., defendant, Ruby Bea and her children left Mrs. Washington's house. Ruby Bea had asked defendant to walk her and her children home. According to Ruby Bea, defendant walked her and her children all the way to her home. According to defendant, he walked Ruby and her children partway home, then left them to try to find Leslie Bea. Defendant was unable to find Leslie Bea and went to his sister's apartment, located one floor below Ruby Bea's apartment. Defendant knocked on the door and no one answered. Ruby Bea heard defendant downstairs and invited him up to her apartment.

Ruby Bea and defendant stayed in Ruby's apartment until the children went to bed in Ruby's bedroom. The children went to bed fully clothed, as there was no heat in the apartment. Sometime later that evening, Ruby Bea and defendant went downstairs to Gloria Stewart's apartment. The children were left alone. The front door to Ruby Bea's apartment was left unlocked. The back door, which led from the kitchen to a porch, was nailed shut and had a refrigerator pushed against it.

When defendant and Ruby Bea arrived at Gloria Stewart's apartment, Gloria Stewart and Leslie Bea were there. At some point, defendant left the apartment. Testimony differed as to whether and when defendant returned.

Sometime after defendant left, Leola and Aretha were discovered to be dead. The back door in Ruby Bea's apartment, which had been nailed shut, had been forced open. Leola was found in the bed. Aretha was found in the backyard of the next building. Both children had been raped.

Leola was naked from the waist down. There was a shirt wrapped tightly around Leola's neck. When it was removed, there was a ligature impression approximately eight-tenths of an inch wide which encircled her neck. She had abrasions on her chest and forehead. There was a lac-

eration of the back wall of her vagina that extended through the muscle which separates the vagina and the rectum. It was the opinion of Dr. Edmund Donoghue, who performed the autopsy, that Leola died of strangulation.

A windbreaker was found wrapped around Aretha's neck. Aretha was naked from the waist down. Aretha had abrasions on the front and right side of her neck. There were numerous other abrasions around Aretha's left eye, on the left side of her face and mouth, below her lip, on her chin, and in front of and on her left earlobe. There were additional abrasions on her right thigh, and a superficial incised wound on her right knee. Aretha's hymen was torn, and a bloody fluid was present in her vagina. There was also bleeding beneath her scalp and a linear fracture of the right parietal bone of her skull. Additionally, there was bleeding beneath one of the membranes of the brain and there was cerebral edema. It was Dr. Donoghue's opinion that Aretha died after strangulation or cerebral injuries. Dr. Donoghue concluded Aretha was dead before she went over the third-floor railing into the backyard of the neighboring building.

After talking with defendant, Leslie Bea, Gloria Stewart, Ruby Bea, Percy Hamilton, Mrs. Washington and others, the police placed defendant under arrest on March 4, 1984, for the rapes and murders of Leola and Aretha Bea.

Defendant alleges numerous errors at all stages of the proceedings. Because we reverse the convictions and remand for a new trial, we need not address all the issues raised. Only the evidence necessary for a resolution of the issues addressed in this opinion will be discussed.

## I. Pretrial Motions

### A. Motion to Quash Arrest

Defendant made a pretrial motion to quash his arrest.

The circuit court denied the motion. The following evidence was adduced at the hearing on the motion to quash arrest.

Earceaner Seattle Washington, mother of defendant, testified that two detectives in civilian clothes knocked on her door at 6950 South Peoria at 5:45 a.m. on March 4, 1984. When she opened the door, the two detectives walked in and asked if defendant was there, and if she thought defendant would mind going down to the station to answer some questions.

After telling the detectives defendant was sleeping, Mrs. Washington testified, the detectives told her to wake defendant. Mrs. Washington shook defendant to wake him, and the detectives were standing over her shoulders. One of the detectives asked defendant if he would mind going down to the station to answer some questions, and defendant responded, "Well, I don't guess I have a choice."

The detectives asked Mrs. Washington if she wanted to go down to the station. Mrs. Washington asked if she had to go, and one of the detectives said, "Yes, we would like to ask you some questions, too." Mrs. Washington said the detectives would not let defendant change clothes. Although the detectives did not have their guns drawn, Mrs. Washington testified each detective had his coat brushed back and had his hand on his holster, exposing his gun. Mrs. Washington, defendant, and the two detectives went by car to the police station.

Except for the two times Mrs. Washington went with the police to search her house, she was at the police station from approximately 6 a.m. until midnight. Although she asked if she could leave to go to a store, she was told she could not.

Mrs. Washington only saw defendant one time after he was put in the interview room upon arrival at Area 3. Two or three hours after Mrs. Washington and defendant arrived at Area 3, defendant, accompanied by two police offi-

cers, came out of the interview room he was in, bent over with tears in his eyes, and went to the water fountain.

According to Mrs. Washington, Percy Hamilton and three or four more people were in the waiting room. Mrs. Washington said her daughter, Gloria Stewart, and her daughter's boyfriend, Leslie Bea, were not in the waiting room; they were in interview rooms. Mrs. Washington eventually was taken into an interview room and questioned.

Defendant testified he had been sleeping on the couch in his mother's living room when the police arrived at his mother's apartment. He had been asleep about an hour or so. He was wearing black pants and a tee shirt. Defendant's mother, Mrs. Washington, woke defendant. The police were standing by his mother. Defendant may have heard his mother tell him the police wanted him to go to the station with them. Defendant also thought one of the detectives asked him if he would go down to the station. Defendant told the detectives, "That it didn't seem like I had much of a choice."

Defendant asked if he could change his clothes and brush his teeth, and if he could put on his socks. Defendant testified the detectives told him he could not. Defendant stated at least one of the two detectives had his hand by his holster in such a way that he could see the detective's gun.

Defendant testified that when his mother went to get her coat, one of the detectives searched him. Neither detective told defendant he was under arrest, nor was defendant handcuffed at that time. Defendant stated he had been previously placed under arrest without being handcuffed.

Defendant grabbed a jacket and went with his mother and the two detectives to the unmarked police car. Defendant was not handcuffed during the ride to Area 3 Violent Crimes headquarters. When defendant arrived at the police

station, he was placed in an interview room. Defendant testified he did not feel free to leave when he first arrived at the police station.

Detective Walter J. Szamolewicz, assigned to Area 3 Violent Crimes of the Chicago police department, testified for the State. Detective Szamolewicz and his partner, Detective Henry Leja, went to 6950 South Peoria with the purpose of interviewing one of the remaining witnesses who had been at Gloria Stewart's apartment the night before. Detective Szamolewicz could not remember the name of the supervisor who sent him and his partner to 6950 South Peoria to interview defendant.

Detective Szamolewicz knocked on the door, and Mrs. Washington answered. Detective Szamolewicz introduced himself and his partner, showed Mrs. Washington his badge, and told Mrs. Washington they would like to interview defendant. Mrs. Washington told the detectives she was defendant's mother, and told them to "come in." After defendant's mother woke him, Detective Szamolewicz informed defendant that he and his partner were police officers, and then told defendant his name and that of his partner. Detective Szamolewicz stated he told defendant the detectives would like to interview him about the death of two little girls and asked defendant if he would accompany the detectives to Area 3. Detective Szamolewicz testified the defendant said "Sure." According to Detective Szamolewicz, Mrs. Washington asked if it would be all right if she went with him, and Detective Szamolewicz said it would be.

Detective Szamolewicz was armed, but his gun was completely concealed. Defendant never asked to change clothes, brush his teeth, or put on a pair of socks. Detective Szamolewicz did not know defendant had been arrested and charged on a prior case involving the alleged rape of a young girl. No one searched defendant.

Defendant argues he was illegally arrested at his home, relying on *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371. Defendant argues the circuit court erred when it denied defendant's motion.

In *Payton*, the Supreme Court held "the Fourth Amendment to the United States Constitution *** prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." (*Payton*, 445 U.S. at 576, 63 L. Ed. 2d at 644, 100 S. Ct. at 1374-75.) The police in *Payton* had evidence sufficient to establish probable cause to believe the defendant had committed murder. The police did not obtain a warrant to arrest the defendant, but went to his apartment one morning at 7:30 a.m. Lights were on at the defendant's apartment and music was being played, but no one answered the door. The police summoned emergency assistance, and later used crowbars to break open the door and enter the apartment.

Although no one was in the apartment, the police found a .30-caliber shell casing in plain view which was later used in evidence at the defendant's trial. The Supreme Court held that the State statute which authorized police officers to enter a private residence without a warrant and with force, if necessary, to make a routine felony arrest was unconstitutional because it violated the fourth amendment.

The circuit court in the case at bar denied defendant's motion to quash his arrest. The circuit court did not find the evidence presented by defendant to be credible. The circuit court did not believe the officers came into Mrs. Washington's house without her consent, ordered her to wake defendant, ordered defendant and his mother to go to Area 3, refused defendant permission to change clothes or brush his teeth, and then frisked defendant. The circuit court found the evidence presented by the State to be credible. The police officers identified themselves, requested and received permission to enter Mrs. Washing-

ton's home, asked Mrs. Washington to wake defendant, and asked defendant to go to Area 3 to answer questions concerning the events of March 3-4 at 6712 South Halsted. Detective Szamolewicz denied defendant requested to change clothes or brush his teeth. He also testified his gun was completely concealed. Detective Szamolewicz testified defendant agreed to go with the police officers and expressly denied defendant was frisked. Defendant was never told he was under arrest and was not handcuffed. The circuit court concluded no arrest took place at defendant's home.

The evidence presented by defendant at the hearing on the motion to quash arrest conflicted with the evidence presented by the State. It is the function of the circuit court to weigh the evidence and determine the credibility of the witnesses. (*People v. Henderson* (1965), 33 Ill. 2d 225, 229.) A reviewing court will not disturb a circuit court's ruling on a motion to quash arrest unless that finding is manifestly erroneous. (*People v. Gacho* (1988), 122 Ill. 2d 221, 234; *People v. Cabrera* (1987), 116 Ill. 2d 474, 485-86.) The circuit court's ruling that defendant was not arrested in his home is supported by the evidence presented by the State. We cannot say the circuit court's ruling is manifestly erroneous; accordingly, the ruling of the circuit court denying defendant's motion to quash arrest is affirmed.

### B. Motion to Suppress Evidence

Defendant made a motion to suppress evidence which was denied. The following evidence was adduced at the hearing on defendant's motion to suppress evidence. William Foley, a detective with the Chicago police department, testified for the State. Detective Foley came on duty at Area 3 at approximately 9 a.m. on March 4, 1984. At 10:30 a.m., Detective Foley and his partner, Detective Ce-

gielski, interviewed defendant in the interview room for approximately 30 minutes.

Before the interview with defendant, Detective Foley was aware that other witnesses were present at Area 3, but was not aware anyone was accusing defendant of killing the two children. Detective Foley knew the results of some interviews before he first spoke with defendant, but did not know the results of interviews with defendant's mother, defendant's sister, or the mother of the deceased children. He only knew the results of the interviews with the neighbors of the Bea family.

Detective Foley did not know how long defendant had been in the interview room before he talked with defendant at 10:30 a.m. Detective Foley assumed defendant was a witness and did not consider defendant a suspect. According to Detective Foley, defendant was not in custody. To the best of his knowledge, Detective Foley considered defendant free to go. Defendant was not under arrest. Defendant was not handcuffed and was not given *Miranda* warnings at the 10:30 a.m. interview.

At approximately 12:30 p.m. or 1 p.m. on March 4, Detective Foley gave defendant some food, which was paid for by Detective Foley. There was no conversation between Detective Foley and defendant at this time. Detective Foley and his partner, Detective Cegielski, next interviewed defendant at 1:30 p.m., at which time defendant was told he was under arrest for homicide and was orally given *Miranda* warnings by Detective Foley. Detective Foley testified that defendant understood each and every right given to him. Defendant's face was not swollen; defendant was not bleeding.

At the 10:30 a.m. interview, defendant had given an account of where he was and what he had observed the night of the homicide. The 10:30 a.m. interview and the 1:30 p.m. conversation with defendant were similar. At the conclusion of the 1:30 p.m. conversation, which lasted approxi-

mately 30 minutes, defendant was handcuffed: one hand in one handcuff and the other handcuff in a ring attached to the wall.

The third time Detective Foley and his partner, Detective Cegielski, interviewed defendant was at approximately 7:45 p.m. Defendant was orally advised of the *Miranda* warnings, and the conversation lasted approximately 15 minutes.

The fourth time Detective Foley had a conversation with defendant was around 9:30 p.m. Also present was Assistant State's Attorney Irvin Miller. At that time, defendant was again given *Miranda* warnings and was informed Mr. Miller worked with the police department and was not a lawyer for defendant. The conversation lasted approximately 30 minutes.

At 10:10 p.m., defendant asked Detective Foley if he could speak with Mr. Miller alone. Mr. Miller then talked with defendant; Detective Foley did not talk with defendant after that time.

Detective Foley testified neither he nor his partner ever threatened defendant in any fashion. Detective Foley also testified that neither he, his partner, nor Mr. Miller ever had any physical contact with defendant in any type of threatening manner. No promises were made to defendant by either Detective Foley or his partner. Detective Foley testified that at all times when he talked with defendant, defendant seemed coherent and normal.

Detective Foley did not know where defendant was taken after his conversations with defendant were finished; he did not know whether defendant attempted suicide. All the conversations between Detective Foley and defendant took place in the same interview room. Detective Foley did not believe defendant was allowed any civilian visitors.

James Higgins, a detective with the Chicago police department, also testified on behalf of the State. Detective Higgins was one of several detectives assigned to the in-

vestigation of the Bea children's homicide. His duties were to locate any witnesses and gather any evidence which would pertain to the Bea children's homicide. Detective Higgins was involved in putting together the police report on the arrest of defendant. Although Detectives Higgins', Foley's and Cegielski's names are listed on the report as arresting officers, Detective Higgins testified he was not an arresting officer.

Detective Higgins saw defendant in the interview room at Area 3 sometime in the morning of March 4, 1984. Sometime around 4 p.m. or 5 p.m., Detective Higgins took defendant to the washroom. Detective Higgins did not remember if defendant was handcuffed at the time he took defendant to the washroom. During the five minutes or so it took to take defendant from the interview room to the washroom and back to the interview room, Detective Higgins did not see any other witnesses. Detective Higgins testified defendant did not ask if he could talk to his family; Detective Higgins could not recall if defendant's mother, Mrs. Washington, was at Area 3.

Except for seeing defendant alone in the interview room sometime in the morning, and taking defendant to the washroom and back around 4 or 5 p.m., Detective Higgins did not have any contact with defendant. Detective Higgins testified that, while taking defendant to the washroom, he did not have any conversation with defendant, nor was he present when anybody else had a conversation with defendant. Detective Higgins testified he never threatened defendant, never had any physical contact with defendant of a threatening nature, never beat or abused defendant, and never made any promises to defendant. Defendant never asked Detective Higgins if he could make a phone call, nor did defendant ask for time to sleep or rest.

Craig Cegielski, a detective with the Chicago police department, also testified on behalf of the State. Detective

Cegielski and his partner, Detective Foley, spoke with defendant at 10:30 a.m. on March 4, 1984. Detective Cegielski did not continuously rest his hand on his gun, which he was wearing on his belt, during this conversation. At that time, defendant was not given the *Miranda* warnings; defendant was given the *Miranda* warnings at 1:30 p.m. At approximately 7:45 p.m., Detective Cegielski and Detective Foley had a conversation with defendant, which lasted 15 minutes or so; defendant was advised of the *Miranda* warnings by Detective Foley. Detective Cegielski and Detective Foley wrote down notes from the conversations with defendant; Detective Cegielski did not have any idea where the notes were. Detective Cegielski testified that neither he nor his partner ever threatened defendant in any manner. Defendant appeared "alert, coherent, and responsive."

Detective Cegielski came on duty at Area 3 around 8:15 a.m. or 8:30 a.m. on March 4; Detective Cegielski was not certain whether he knew how long defendant had been in the interview room when he and Detective Foley first interviewed defendant at 10:30 a.m. Detective Cegielski denied that defendant was bleeding from the mouth when he spoke to defendant. Further, Detective Cegielski never hit defendant. Defendant was not told he was free to leave at the conclusion of the first interview. Detective Cegielski had his gun on his belt and could not recall if his jacket was removed during the 10:30 a.m. conversation.

Detective Cegielski was unaware of defendant's criminal background at the 10:30 a.m. conversation with defendant. Detective Cegielski may have run a bureau of identification sheet on defendant. Detective Cegielski did not know what time he would have run a sheet on defendant, if he had done so at all; Detective Cegielski did not know whether any other officers ran a sheet on defendant prior to the 10:30 a.m. conversation.

Detective Cegielski was unaware of any requests by any member of defendant's family to see defendant. Detective Cegielski denied ever hitting defendant with a wastepaper basket; further, no one else hit defendant with a wastepaper basket. Detective Cegielski never kicked, hit, or told defendant that his family would be killed if defendant did not cooperate.

Irvin Miller, assistant State's Attorney and supervisor of the felony review unit, testified on behalf of the State. Mr. Miller was called at home concerning defendant's case, and arrived at Area 3 at approximately 9 p.m. on March 4, 1984. When he arrived, Mr. Miller talked with another assistant State's Attorney and several detectives. At approximately 9:30 p.m., Mr. Miller first talked with defendant; Detective Foley was present during this conversation. Mr. Miller orally gave *Miranda* warnings to defendant, and testified that defendant understood each right. The first conversation lasted approximately 30 minutes.

At 10:10 or 10:15 p.m., defendant knocked on the door and asked a police officer, most likely Detective Foley, to get Mr. Miller. Mr. Miller went into the interview room with defendant for a conversation which lasted approximately 45 minutes. During this time, an assistant State's Attorney, and then Lieutenant Stibboch, entered the room for no more than 30 seconds each.

At approximately 11:15 p.m., defendant indicated to Mr. Miller that defendant wished to make a statement. Mr. Miller explained the role of a court reporter and told defendant a court reporter could be present. Defendant told Mr. Miller that defendant wanted to say his statement in his own words. It took defendant approximately two hours and 15 minutes to write his statement. Defendant finished writing his statement at approximately 1:30 a.m. on March 5, 1984. Several times during this period, Mr. Miller and an assistant State's Attorney, together and individually, checked on defendant for a period of a few sec-

onds. Defendant wrote out his statement on a preprinted form which contained *Miranda* warnings on the top of each page.

At 1:30 a.m., Mr. Miller went into defendant's interview room and defendant read his statement. Mr. Miller testified that defendant signed the statement in his presence. At 1:50 a.m., Mr. Miller was present when defendant was photographed on the first floor of Area 3. Defendant signed the back of the photo. Defendant was never handcuffed in Mr. Miller's presence. Neither Mr. Miller nor any other person ever made any promises or threats to defendant to induce the statement, and no one physically beat defendant. Mr. Miller denied that defendant had bruises or blood on his face. Mr. Miller saw nothing irregular about the police conduct toward defendant.

Mr. Miller testified that in response to defendant's request, he wrote out by his own hand a guarantee that defendant had not been beaten by the police and would not be beaten by the police. Mr. Miller signed the guarantee and put his phone number on it. Mr. Miller denied the guarantee was made because defendant felt in fear of his life. At trial, Mr. Miller testified defendant told him defendant thought the police would mistreat him if he confessed. Mr. Miller wrote the guarantee to relieve defendant of the misconception that police abused people who confess to the crime of murdering children.

Mrs. Washington, mother of defendant, testified for the defense at the hearing on the motion to suppress statements. Mrs. Washington arrived at Area 3 at approximately 6:15 a.m. After she was questioned by two officers in an interview room, Mrs. Washington went back to the waiting room and sat about 30 feet away from the interview room in which defendant was located. Mrs. Washington heard police cursing defendant and heard defendant groaning. This occurred about two or three hours after Mrs. Washington and defendant first arrived at Area 3.

From the time Mrs. Washington first heard defendant groaning until she left Area 3 around midnight, she heard defendant groan approximately 20 or 30 times.

Mrs. Washington stated that the police came out of the interview room and told her that she "better tell my son to cop out." Although Mrs. Washington asked to talk with her son several times, she was never allowed to do so. As she did at the hearing on defendant's motion to quash arrest, Mrs. Washington stated that, at one point, defendant came out of the interview room with two officers and—bent over with tears in his eyes—went to the water fountain. Mrs. Washington did not have time to notice whether defendant had any bruises on his arms or face at that time. Defendant then went back to the same interview room, and Mrs. Washington heard "lots of loud cursing going on in there." Sometime during the afternoon, Mrs. Washington was told to go across the hall into another room by a police officer.

Mrs. Washington testified she was given a piece of paper she was told to sign to enable the police to search her house or she would be arrested. Mrs. Washington testified she was asked by detectives if she wanted to be charged with accessory to murder. Mrs. Washington also testified that the only officer who threatened her "point-blank" was one of the officers who twice took her to her home to search it.

Mrs. Washington testified she called the Office of Professional Standards (OPS) and complained that her son was beaten at a police station. On June 15, 1984, two investigators from the OPS came to her home, and Mrs. Washington gave them a written statement.

Mrs. Washington did not see her daughter, Gloria Stewart, at Area 3. Percy Hamilton was in the waiting area during the morning, but not during the afternoon. Mrs. Washington stated that members of the victims' family were in the waiting area when she first arrived at Area

3, but they were probably getting ready to go when she got there.

Mrs. Washington stated Ruby Bea, mother of the victims, was in an interview room, and she heard Ms. Bea crying. Leslie Bea, Mrs. Washington's daughter's fiance, was in an interview room when Mrs. Washington first arrived at Area 3. Mrs. Washington testified she did not hear Leslie Bea cry.

Defendant testified at the hearing on his motion to suppress evidence. On direct examination, defendant testified that during the 15-minute ride from defendant's house to Area 3, defendant was asked why he had been in the penitentiary. When defendant arrived at Area 3, he was placed in an interview room which did not have any chairs. This occurred around 6:10 a.m. Defendant attempted to leave the interview room in order to talk with Leslie Bea, but was told he was not allowed to talk to anyone and was made to go back inside the interview room. Defendant testified Detective Higgins told him this.

After a few minutes of being in the interview room, a lieutenant and three or four plainclothes officers came into the room. Defendant testified he thought the lieutenant was Lieutenant Curtin; one of the plainclothes officers was Officer Higgins, another had blond hair with dark roots, and another had brown hair. The blond-haired officer's last name started with a "C" and ended with an "s-k-i." The officers stayed for 20 or 35 minutes and questioned defendant. Defendant was not given his *Miranda* rights.

After the officers left, two of the above-described officers, the blond-haired man with dark roots and the short man with brown hair, came back in. This was approximately 7 or 8 a.m. Defendant was not given his *Miranda* rights; defendant testified that after he asked for a lawyer, he was told he did not deserve one. Further, the officers told defendant he had just gotten out of the penitentiary

for the same thing, and he was going to go back to the penitentiary.

Sometime after this second interview, defendant asked Detective Higgins if he could go home, and Detective Higgins told defendant he could not. According to defendant, Detective Higgins, the officer with the blond hair with dark roots and the short officer with brown hair came back into the interview room. None of the three had coats on and their pistols were showing. The brown-haired officer informed defendant that if he did not talk, defendant would be beaten. The blond-haired officer hit defendant with the heel of his hand, knocking defendant against the wall, and slapped defendant. The blond-haired officer left, and the brown-haired officer told defendant if defendant did not cooperate his partner would beat the hell out of defendant. At this point, either the brown-haired officer or Detective Higgins took defendant to a water fountain, after which defendant was taken back to his room.

Defendant testified that after he was back in the room, Detective Higgins and the blond-haired officer beat him some more. The blond-haired officer kicked a garbage can and hit defendant's hand; he hit defendant in the face; he repeatedly hit defendant in the chest with the heel of his hand in such a manner that defendant was knocked against the wall.

Another officer, a thin, small man, then came and talked to defendant. This plainclothes officer told defendant that there was evidence against him, and defendant should tell the truth. Defendant testified he asked this officer for a counselor. Defendant testified he consistently asked everyone for counsel throughout all this time.

Later, the three officers (Detective Higgins, the blond-haired officer and the brown-haired officer) returned to the interview room. Defendant testified he was never really left alone; sometime after the above-described meetings some other officers talked with defendant. Defendant testi-

fied that these officers tried to tell him they had a case against defendant, there was nothing defendant could do, and defendant was going to be sent to the penitentiary.

Defendant testified he saw two State's Attorneys around 2 a.m.: Mr. Miller and a female. Defendant testified he told Mr. Miller he had been beaten. According to defendant, Mr. Miller told defendant that defendant would get the electric chair if defendant did not cooperate. By cooperate, defendant testified Mr. Miller meant for defendant to sign a statement.

Mr. Miller told defendant that defendant must talk with either him or the officers; Mr. Miller left the interview room and the officers came in. The officers beat defendant again. The officers left and Mr. Miller came back in and told defendant to fill out a statement. Defendant testified that Mr. Miller drew a diagram showing Ruby Bea's house; Mr. Miller told defendant where the children were supposed to have been killed.

After telling Mr. Miller he had been beaten and was fearful of being beaten again, defendant asked Mr. Miller for some type of protection. Mr. Miller wrote a statement to defendant saying defendant had not been beaten and would not be beaten, signed the statement, and put his phone number on it. Defendant then wrote out a statement, which defendant signed and Mr. Miller signed.

Later, defendant was taken downstairs where a photograph was taken. Defendant was then taken to 61st and Racine. On the way to 61st and Racine, defendant was taken to a drive-through restaurant for food. Defendant stayed in a holding cell at 61st and Racine for 10 or 15 minutes, then more mug shots were taken and defendant was fingerprinted. After this, defendant was taken back to Area 3, where he was put back in the interview room.

Defendant testified he tried to commit suicide by hanging. After this, defendant was again taken to 61st and Racine, and someone took fingernail and hair clippings. Later,

defendant was taken to the county jail. Defendant saw both a doctor and a judge, but was not sure whom he saw first. He told the judge he had been beaten. The judge directed that defendant be taken to a doctor. Defendant also saw a paramedic and a clinical psychologist. Defendant told the psychologist, Dr. Zoot, that he had tried to commit suicide because the police had beaten him. Defendant testified he did not make his written statement voluntarily.

On cross-examination, defendant testified he thought the blond-haired police officer with dark roots was Detective Cegielski. Defendant testified that Detective Higgins and the blond-haired officer came in to talk to him the second time.

Defendant testified Detective Higgins and the blond-haired officer both hit him. After the third or fourth time the various police officers came and went, defendant testified, he was handcuffed. This happened about three to four hours after the police brought defendant to Area 3.

During cross-examination, the prosecutor asked defendant to relate what he remembered beyond the last time the brown-haired detective struck him. Defendant testified he remembered that Assistant State's Attorney Miller came in. Sometime between the time defendant was struck by the brown-haired detective and the time Mr. Miller came in, defendant testified, he was taken to either the water fountain or the bathroom. While on the way to the water fountain, defendant saw his mother but did not see Percy Hamilton.

According to defendant, at no time while he was at Area 3 was he ever told by any officer of his *Miranda* rights. Defendant testified he was never fed while at Area 3. Defendant testified he might have been struck 30 or 35 times by the police.

Defendant testified he was bleeding from being beaten by the police, and that the blood might have been on the inside of his mouth; defendant also testified that there

might not have been any blood. Defendant's chest and head were hurting him. Defendant's back, between his shoulder blades, was hurting. Defendant stated that before being taken to the fast-food restaurant, he was taken to a hospital.

Defendant testified that Mr. Miller came in the first time alone at approximately 2 a.m. on March 6. Defendant told Mr. Miller he had been beaten. According to defendant, at no time did Mr. Miller ever advise him of his *Miranda* rights. Mr. Miller told defendant if he did not make a statement, defendant would see the police again. Defendant thought he was handcuffed at this time, and that Mr. Miller unhandcuffed him, but defendant was not sure. Defendant told Mr. Miller he would not sign a statement, and Mr. Miller left. The blond-haired detective, and maybe two more officers, came back into the interview room. The officers brought in chairs. The officers stayed about five minutes, and told defendant he had to make a statement. The officers left after one of them grabbed defendant by his clothes.

Mr. Miller again came into the room by himself. Defendant testified he thought the officers who had preceded Miller unhandcuffed him. Defendant testified that he sat in a chair for the first time that day during the second conversation with Mr. Miller. The conversation lasted seven or eight minutes. At this time, or sometime previously, defendant was given a bunch of paper.

Mr. Miller left again. The police came back in; defendant testified he thought it was the same three who had previously come in. The blond-haired detective then hit defendant against the wall. According to defendant, the blond-haired officer threatened to take defendant to the basement to hurt him. Defendant was told that he would have to do whatever Mr. Miller told him to do. Defendant did not think he was handcuffed at this time, but that he

was handcuffed before the officers left. The detectives were there about five minutes.

At this time, a female assistant State's Attorney came in; defendant testified he did not think she introduced herself. Defendant was handcuffed and was sitting on the floor. The assistant State's Attorney sat down on a chair across from defendant and told defendant not to be afraid and for defendant to trust her. Defendant testified the assistant State's Attorney was two or three feet from defendant, had her legs spread apart and was not wearing any undergarments. Defendant further testified he did not know this person was an assistant State's Attorney until he read her signature on his written statement. She stayed two or three minutes and then left. This was the only time defendant ever saw her.

At that point, defendant thought two or three officers came in, and one of the officers might have been Officer Higgins. Defendant was unhandcuffed; defendant told the officers he would make a statement. Mr. Miller came back in at that time, and the officers left, although maybe one stayed. Defendant remembered Officer Higgins sitting at the table with defendant and Mr. Miller, but he was unsure when that occurred.

Mr. Miller had brought in a bunch of paper with him. Defendant testified he had written out two statements sometime prior to Mr. Miller's coming in this third time, but the statements were ripped up by the police. One of the statements was ripped up by the police outside the defendant's presence; the other was ripped up by the police in his presence. This occurred possibly two hours before defendant first met Mr. Miller. One of the officers may or may not have been Officer Higgins. The statements were ripped up because the officers said defendant had not correctly written what had happened.

When Mr. Miller came in the third time, defendant wrote what was a 2½-page or 3-page statement. There

may have been an officer present; it may have been Officer Higgins. It took about two or three minutes to write out, and then Mr. Miller tore it up. Defendant testified Mr. Miller told defendant the statement did not contain what he wanted to hear.

Mr. Miller left at this point, and there may or may not have been an officer who stayed with defendant. Mr. Miller then came back in. At this point defendant did not think there was an officer present. Mr. Miller drew a diagram of Ruby Bea's house, and explained to defendant where the dead girls were found. Defendant then wrote out a fourth statement. This statement took about 10 minutes to write. This statement was longer than 2½ pages. Defendant testified that Mr. Miller took some of the pages and had defendant do them over. The final statement took about 20 minutes to write.

Mr. Miller never read the final statement back to defendant. Defendant did not sign the statement until after Mr. Miller made the written guarantee that defendant would not be beaten. Mr. Miller wrote two notes for defendant; defendant testified the first note was not concrete enough to serve as the protection he had requested.

Defendant denied that Mr. Miller gave him the protection note before defendant ever made any written statements. Defendant denied that anyone was with Mr. Miller when Mr. Miller read the statement back to defendant. Defendant denied the statement was read back to him.

About 10 minutes after defendant finished the fourth written statement, he was photographed. Defendant was taken to District 7 for fingerprinting and booking, then back to Area 3. Defendant testified he was not told he had been charged with the murders of the two Bea children. Back in the same interview room, defendant's right hand was handcuffed to the wall. After 20 minutes, the blond-haired officer and another came in and said "harsh" things to defendant, which defendant was unable to remember.

Before 30 minutes had passed, defendant testified, he attempted to commit suicide.

Defendant testified he took approximately a one-inch piece of cloth from the bottom of his tee shirt, put it around his neck, tied it to the bars on the screen covering the window and just sat back, thinking his circulation would be cut off. Defendant did not remember what happened next, but several officers came in.

On redirect examination, defendant testified he had given descriptions of the officers who had beaten him to an OPS officer.

Dr. Randy Zoot, an employee of the mental health staff of Cook County-Cermak Health Services, testified for the defense at the suppression hearing. Dr. Zoot, who has a Ph.D in clinical psychology, is on staff of the Health Services' psychiatry department. On March 6, 1984, Dr. Zoot interviewed defendant. Defendant was brought to Dr. Zoot's attention after an initial screening of defendant by a psych-trained officer. Dr. Zoot testified that defendant had reported a suicide attempt while in police lockup. Dr. Zoot testified defendant told her he attempted suicide because of police beatings. On cross-examination, Dr. Zoot stated that in her report she noted no visible signs of either a suicide attempt or beatings. Further, Dr. Zoot stated defendant denied any past psychiatric problems. On redirect examination, Dr. Zoot testified she was not a medical doctor and her observations were based on what she observed from across her desk.

The circuit court had before it defendant's report to Investigator Benefico of the OPS, made on April 5, 1984. In the report, defendant stated he had not been "struck or physically abused during the interrogations conducted during the day." Defendant reported to Investigator Benefico that the beatings had started in the early evening; defendant stated he had a headache and a stomachache after the beatings.

Finally, the defendant and the State stipulated to a report made by David Gryczewski, a medical technician at the Health Services on March 6, 1984. The report stated that defendant complained of a headache and pain to the right posterior shoulder. At trial, Mr. Gryczewski testified he did not see any bruises, cuts, or swellings on defendant. Mr. Gryczewski noted on his report that defendant had a head injury; on reexamination, Mr. Gryczewski explained the head injury occurred in 1972.

Defendant makes two arguments in support of his claim that the circuit court erred in failing to suppress evidence. First, the circuit court erred when it concluded defendant was not illegally arrested at some time prior to his having been formally placed under arrest at 1:30 p.m. Second, the circuit court erred when it found defendant's confession to have been voluntarily given. These arguments will be addressed in turn.

### (i) Validity of Arrest

This court has stated before that "the elements of a valid arrest were present when the police informed defendant of a violation, he submitted to their control, and '[t]he evidence clearly shows *** that the officers intended to effect the arrest and that the defendant so understood them.' " (*People v. Wipfler* (1977), 68 Ill. 2d 158, 165, quoting *People v. Clark* (1956), 9 Ill. 2d 400, 404.) The *Wipfler* court went on to state: "The accepted test of understanding is not what the arrestee thought, but 'what a reasonable [person], innocent of any crime, would have thought had he been in the defendant's shoes.' " *Wipfler*, 68 Ill. 2d at 166, quoting *Hicks v. United States* (D.C. Cir. 1967), 382 F.2d 158, 161.

In *United States v. Mendenhall* (1980), 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870, the Supreme Court stated:

"We adhere to the view that a person is 'seized' only when, by means of physical force or a show of authority, his

freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' " *Mendenhall*, 446 U.S. at 553-54, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877, quoting *United States v. Martinez-Fuerte* (1976), 428 U.S. 543, 554, 49 L. Ed. 2d 1116, 1126, 96 S. Ct. 3074, 3081.

Defendant argues that he was not free to go after he was taken from his home, transported to the police station, and placed in an interrogation room. Defendant asserts that a reasonable person under these circumstances would feel he was under arrest.

Defendant's argument that he was illegally placed under arrest while at Area 3 sometime prior to being formally placed under arrest at 1:30 p.m relies primarily on *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248. In *Dunaway*, the defendant had been implicated in a crime by an informant. Although there was insufficient information to obtain an arrest warrant for the defendant, three detectives were told to "pick up" the defendant and "bring him in." (*Dunaway*, 442 U.S. at 203, 60 L. Ed. 2d at 829, 99 S. Ct. at 2251.) The three detectives found the defendant at a neighbor's house, and the defendant "was taken into custody; although he was not told he was under arrest, he would have been physically restrained if he had attempted to leave. [Citations.] He was driven to police headquarters in a police car and placed in an interrogation room, where he was questioned by officers after being given" his *Miranda* rights. (*Dunaway*, 442 U.S. at 203, 60 L. Ed. 2d at 830, 99 S. Ct. at 2252.) The defendant waived counsel and made incriminating statements which were used against him at trial.

The Supreme Court held that the police conduct in *Dunaway* violated the fourth and fourteenth amendments

when "without probable cause, they seized [the defendant] and transported him to the police station for interrogation." (*Dunaway*, 442 U.S. at 216, 60 L. Ed. 2d at 838, 99 S. Ct. at 2258.) In *Dunaway*, the Supreme Court concluded that "detention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." *Dunaway*, 442 U.S. at 216, 60 L. Ed. 2d at 838, 99 S. Ct. at 2258.

Defendant cites *People v. Holveck* (1988), 171 Ill. App. 3d 38, *People v. McMahon* (1980), 83 Ill. App. 3d 137, *People v. Dowdell* (1980), 81 Ill. App. 3d 266, and *People v. Townes* (1982), 91 Ill. 2d 32, as cases where *Dunaway* was applied to find an illegal arrest.

The appellate court in *Holveck* found the defendant to have been illegally arrested when two police cars stopped the defendant as he was driving in a lawful manner and asked the defendant to go to the police station for questioning. Both squad cars accompanied the defendant to the station. The defendant was taken to a small room, his driver's license was taken from him, he was given his *Miranda* rights, and questioning began. Within a half hour, the defendant made incriminating statements. The appellate court concluded that, under the circumstances confronting the defendant, a reasonable person would not have believed he was free to leave.

The defendant in *McMahon* was found sitting on a bench outside an office which had been burglarized approximately a week before. Two police officers, who had seen a shoeprint in a spilled lemonade mixture on the floor of the office, asked to see the bottoms of the defendant's shoes. Because the pattern of the defendant's shoes was similar to the pattern of the shoeprint in the burglarized office, the police officers asked the defendant to go to the police station with them. The defendant was given the *Miranda* warnings, signed a waiver form, and was questioned about

the burglary. A police officer directed the defendant to take off one of his shoes, which the defendant did. The defendant made incriminating statements 10 to 15 minutes after he signed the waiver form. Forty-five minutes later, the defendant made an oral confession, followed by a written confession.

The *McMahon* court, relying on *Dunaway*, concluded the defendant was arrested without probable cause. The only facts connecting the defendant with burglary at the time he was taken into custody were the alleged similarity of the pattern on the bottom of the defendant's shoe to the pattern the officers had seen in the spilled mixture on the floor of the burglarized office, and the proximity of the defendant to the office. As such, defendant's arrest was illegal.

The police in *Dowdell* went to the defendant's girlfriend's house and asked defendant to go to the police station for questioning. The police refused to tell the defendant what he was to be questioned about. The defendant went with the officers, was placed in an interrogation room, and after having been given the *Miranda* warnings, was questioned about a burglary. Only after the defendant made incriminating statements about another burglary was the defendant arrested.

The *Dowdell* court concluded that the case involved "a deliberate special trip to an apartment where the defendant was thought to be by three police officers suspicious of the defendant but without probable cause for his arrest." (*Dowdell*, 81 Ill. App. 3d at 270.) The facts were so similar to *Dunaway* the *Dowdell* court concluded the motion to suppress should have been granted.

In *Townes*, the police went to the defendant's home and told defendant they wanted to speak to him at the police station about a certain crime. Defendant went to the station, where he was taken into an interview room, read the *Miranda* warnings and was interviewed four times be-

tween 9:30 a.m. and 2 p.m. Defendant was then taken to a medical center for hair samples and fingernail scrapings. He was then taken back to the police station and placed in a lineup at 4 p.m. The victim of the crime was unable to identify the defendant as her assailant. The defendant was again interviewed from 6 p.m. until 10:10 p.m., at which time the defendant was formally charged. The defendant's statements in this final interview were introduced at defendant's trial.

This court found the defendant's fourth amendment rights violated when the defendant was subjected to a lengthy interrogation at a police station when there was not probable cause for arrest. The court concluded that the circumstances surrounding defendant's interrogations were such that a reasonable person would not have believed he was free to leave. This court found that "[t]he circumstances indicate[d] that the officers interrogated the defendant in the hope of obtaining sufficient information upon which to predicate the probable cause necessary for an arrest." *Townes*, 91 Ill. 2d at 37-38.

The evidence presented by defendant at the hearing on the motion to suppress conflicted with the evidence presented by the State. According to defendant, he was awakened on the orders of the police, frisked, and hurried out of his home after having been denied an opportunity even to brush his teeth. On the way to Area 3, defendant was asked by the officers about his prior criminal record. Upon his arrival at Area 3, defendant was put into a small room where he was continuously and repeatedly verbally harassed and physically abused. Defendant was never fed while at Area 3. Defendant was never given *Miranda* rights by any police officer or any assistant State's Attorney. Defendant was not informed why he was under arrest. Defendant was told by Detective Higgins he did not deserve a lawyer.

This contrasts with the evidence presented by the State. Detective Szamolewicz asked defendant if he would go to Area 3 to answer questions about the death of two little girls. Defendant agreed to go, and defendant did not ask for any time to change clothes or brush his teeth. Defendant's mother asked if she could go with the detectives and defendant and was allowed to do so. Detective Szamolewicz did not know of defendant's prior arrest record.

The testimony of the State's witnesses supports the State's assertion that defendant voluntarily came to Area 3 and voluntarily stayed at Area 3. Defendant was interviewed only once, at 10:30 a.m., before being arrested at 1:30 p.m.; defendant was fed at approximately noon by Detective Foley. Detective Foley gave defendant the *Miranda* warnings before arresting defendant at 1:30 p.m. Defendant was told he was under arrest for the murder of the two Bea children. Neither Detective Foley nor Detective Cegielski knew of defendant's criminal background before interviewing defendant at 10:30 a.m. Detective Foley, Detective Cegielski and Detective Higgins all specifically denied striking or threatening to strike defendant. Detective Cegielski did not see any sign of defendant's having been beaten. Detective Higgins, who denied having any conversation with defendant, did not tell defendant that defendant did not deserve a lawyer.

It is the function of the circuit court in a hearing on a motion to suppress evidence to determine the credibility of the witnesses and to resolve any conflict in their testimonies. In reviewing a circuit court's determination on a motion to suppress, the reviewing court may also consider evidence adduced at trial. (*People v. Caballero* (1984), 102 Ill. 2d 23, 36.) A reviewing court will not disturb a circuit court's determination on a motion to suppress evidence unless it is manifestly erroneous. *People v. Neal* (1985), 109 Ill. 2d 216, 218; *People v. Clay* (1973), 55 Ill. 2d 501, 505.

The circuit court credited the evidence presented by the State which showed defendant voluntarily agreed to come to Area 3, accompanied by his mother, to answer questions about the death of the Bea children. Upon his arrival, defendant was placed in an interview room. Defendant was interviewed only once, at 10:30 a.m., for approximately half an hour before being placed under arrest at 1:30 p.m. Defendant was aware of why he was at Area 3. Defendant knew he had been in his sister's apartment directly below where the killings of the children took place during the late night or early morning hours of March 3-4. Defendant had been aware that the police had been at Ruby Bea's apartment after the killings had become known. Defendant indicated he knew Leslie Bea was at Area 3. Defendant knew other people were also at Area 3. Defendant knew that he, Leslie Bea, Gloria Stewart and Ruby Bea had all been present at Ms. Stewart's apartment the night before.

Unlike each defendant in *Dunaway, Holveck, McMahon, Dowdell* and *Townes*, defendant was not a suspect when police requested him to go to Area 3 to answer questions. Defendant was, like others at Area 3, a potential witness. In none of the above referred-to cases was the defendant considered only one of several potential witnesses being questioned about the same events. In all of the above referred-to cases, the defendants were arrested after making incriminating statements. Here, defendant was arrested only after other witnesses made statements incriminating defendant.

For the above reasons, the circumstances encountered by defendant with the police differed significantly from the circumstances encountered by the defendants in *Dunaway, Holveck, McMahon, Dowdell* and *Townes*. The circuit court's determination that a reasonable person would not have believed he was not free to go, in light of the foregoing, was not against the manifest weight of the evidence. Accordingly, the circuit court's denial of defendant's motion

to suppress based on the argument defendant was illegally arrested before being formally placed under arrest at 1:30 p.m. is affirmed.

### (ii) Voluntariness of Confession

Defendant also argues that the State violated his fifth and fourteenth amendment rights when it used coercive and improper tactics to procure his statements. Specifically, defendant argues his statement was involuntary.

Defendant's written confession contained the following information.

Ruby Bea, Leslie Bea and defendant left defendant's mother's house at 6950 South Peoria to go to Ruby Bea's apartment at 6712 South Halsted. Leslie went back to 6950 South Peoria to get something he forgot. Ruby and defendant continued walking toward her apartment. Defendant then left her and her three children and met Leslie. Defendant gave Leslie some toys he had purchased for his nephew and then went back home. Defendant then left and went to Ruby's house. Defendant knocked on Leslie's door; no one answered. Ruby asked defendant to come to her apartment. Defendant stayed there approximately 20 minutes, then Ruby and defendant went to buy beer. Ruby and defendant returned to Ruby's apartment and drank some beer. Defendant decided to leave.

Ruby's brother-in-law, Richard Bea, knocked downstairs and Ruby went to talk with him. Richard Bea left after a few minutes, and Ruby and defendant talked for about 40 minutes. Leslie and Gloria came back and Ruby and defendant went to their apartment. Defendant left to purchase another beer, returned, had a few sips and left.

Defendant then went to the lounge where his brother, Joe Stewart, worked. Defendant sat around his house for 20 to 25 minutes, then went back to Ruby Bea's house. Defendant initially wanted to talk with Ruby. Defendant went inside Ruby's apartment; the front door was un-

locked. Defendant used the bathroom, went to the living room, went to the bedroom where the children were sleeping, went back to the living room, and took a pill someone had given him on the streets.

Five to 10 minutes later, defendant took one of the children to the kitchen, where he "proceeded to take liberties with her." Defendant then tied her up ("hands, etc."). Defendant went back to the bedroom, took the "eldest" of the two and went back to the kitchen. Defendant "then challenged her by taking an unfair advantage over her." Defendant wrote he was "driven into a state of awe/shock when she jumped over the guard railing of the porch."

Defendant then wrote:

> "I extend thee [sic] Mr. Miller ASA this statement with pre-knowledge of its impact on my own life. I came voluntarily to the station to 'hopefully' get this extremely hideous matter resolved. I had a blue pair of jeans on during the afore-mentioned times relating to these matters. The blue pair of pants [shown] as an 'exhibit' by officers were the pants I wore on 3/3/84."

"Whether a statement is voluntarily given depends upon the totality of the circumstances. The test of voluntariness is whether the statement was made freely, voluntarily and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he confessed." *People v. Clark* (1986), 114 Ill. 2d 450, 457; *People v. Prim* (1972), 53 Ill. 2d 62, 70.

This court has long held "the question of the competency of a confession is for the trial court alone to decide, and that the court is not required to be convinced of its voluntary character beyond a reasonable doubt when making its decision." (*People v. Carter* (1968), 39 Ill. 2d 31, 38.) The State has the burden of establishing the voluntariness of a defendant's confession by a preponderance of the evidence. (*People v. King* (1986), 109 Ill. 2d 514, 525; *People v. Caballero* (1984), 102 Ill. 2d 23, 33.) Findings by the cir-

cuit court on the question of the voluntariness of a confession will not be disturbed by a court of review unless they are against the manifest weight of the evidence. *People v. Galvin* (1989), 127 Ill. 2d 153, 174; *King*, 109 Ill. 2d at 525; *People v. Davis* (1983), 97 Ill. 2d 1, 20.

Defendant argues his confession was coerced: defendant was deprived of sleep, kept incommunicado, and was subjected to lengthy and intense interrogation following an illegal detention. The police subjected defendant to mental coercion which took the form of repeated verbal threats and repeated beatings. Additionally, defendant points to the delay in bringing him before a court for a preliminary hearing. Defendant argues these factors, both individually and when taken together, contributed to an atmosphere which was so coercive as to render his confession involuntary.

Sleep is a factor to be considered by the circuit court in making its determination whether a statement is voluntary. (*People v. Pittman* (1973), 55 Ill. 2d 39, 52.) The State introduced evidence that defendant was coherent throughout the day. Evidence was also introduced that defendant was not continuously interrogated and was not subject to lengthy and repeated interrogation.

Defendant was interviewed at 10:30 a.m. for half an hour, given lunch at noon, and arrested and interviewed at 1:30 p.m. for half an hour. Defendant was not questioned again until 7:45 p.m.; the interview lasted 15 minutes. During this time, Detective Foley and Detective Cegielski confronted defendant with a pair of underwear, a brown corduroy jacket, and a sweater that had a reddish stain on the sleeve which had been found at Mrs. Washington's apartment. The detectives also confronted defendant with a pair of jeans that had blood on them, which had been found in a garbage bin behind Sid's Lounge, the place of defendant's brother's employment. Defendant was also told his

relatives were saying defendant came back to Gloria Stewart's apartment with blood on him.

At trial, Detective Foley testified that defendant, after being confronted with the above, said he was up in the third-floor apartment and one of the girls was dead. The next time defendant was questioned was at 9:30 p.m.; the interview lasted half an hour.

Mr. Miller testified at trial that after he told defendant of his *Miranda* rights, he asked defendant if he had any complaints about police treatment, and defendant said he had no complaints. Defendant told Mr. Miller that he had left the second-floor apartment, went to the third floor and saw the three girls sleeping. Mr. Miller testified defendant said he did not remember anything else. Mr. Miller then left defendant alone. At 10:10 p.m., defendant asked to talk with Mr. Miller alone. According to Mr. Miller, defendant told Mr. Miller he remembered more details. Defendant told Mr. Miller he had taken the youngest child into the kitchen, had intercourse with her and then tied her up. Defendant then went back to the bedroom, had intercourse with the older of the two victims, and then tied her up. This girl then ran past defendant, ran out the back door, and jumped over the banisters. Defendant denied strangling the children. Mr. Miller testified defendant admitted the blue jeans with blood on them were his.

The circuit court determined defendant was not considered under arrest before noon and was not placed under arrest before 1:30 p.m. Although defendant testified he was told he could not leave the interview room by Detective Higgins soon after arriving at Area 3, Detective Higgins testified he did not have any conversation with defendant.

Defendant's argument that he was kept incommunicado from the time of his arrival at Area 3 was rejected by the circuit court. The circuit court heard testimony that defendant was free to leave before noon. Defendant was

not so informed by either Detective Foley or Detective Ce-gielski. The voluntariness of a defendant's actions, how-ever, does not depend upon the defendant's having been told he is free to decline to cooperate. *United States v. Mendenhall*, 446 U.S. at 555, 64 L. Ed. 2d at 510, 100 S. Ct. at 1878.

The conflicting evidence concerning whether defendant was beaten by any or several police officers was resolved by the circuit court in favor of the State and against defendant. The circuit court rejected the testimony of Mrs. Washington that she heard her son being beaten. The circuit court heard testimony of numerous State witnesses, including, but not limited to, Detectives Foley, Cegielski and Higgins, and Felony Review Supervisor Irvin Miller, that defendant was never beaten and never had bruises or blood on him. The circuit court had before it the note written by Assistant State's Attorney Irvin Miller stating defendant had not been beaten and would not be beaten. The circuit court rejected defendant's argument that Mr. Miller only wrote the note because defendant had been beaten. At trial, Mr. Miller testified he wrote the guarantee because defendant had the mistaken idea that police officers beat people who confess to crimes involving children.

Although defendant claimed he attempted suicide by trying to hang himself with a one-inch strip of a tee shirt while handcuffed, the circuit court rejected such a claim as incredible. Dr. Zoot testified defendant told her he had attempted to commit suicide because of police beatings. Dr. Zoot also testified she noted no visible signs of either a suicide attempt or beatings in her report. Although defendant told Investigator Benefico of the OPS he had a headache and stomachache after being beaten by the police, defendant told Mr. Gryczewski of Cook County-Cermak Health Services he had a headache and pain in his right posterior shoulder.

The circuit court did not believe defendant's testimony that he repeatedly asked for a lawyer and that he was never given *Miranda* warnings by anyone, including Mr. Miller. The circuit court did not believe the testimony of defendant that the police forced him to write two confessions which the police then destroyed, nor did the circuit court believe the testimony of defendant that Assistant State's Attorney Irvin Miller told him what to write in his statement. The circuit court accepted Mr. Miller's testimony that he offered to have a court reporter present to record defendant's statements, but defendant wanted to write his statement himself. Mr. Miller and another assistant State's Attorney checked on defendant periodically during the 2½ hours it took defendant to write his statement.

Defendant asserts for the first time on appeal that the delay in bringing him before a judge rendered his confession involuntary. Any delay, of course, is just one factor to be considered by the circuit court in determining whether, under the totality of the circumstances, a confession is involuntary. (*People v. Higgins* (1972), 50 Ill. 2d 221, 226.) Defendant in the instant case never specified this as a ground for suppression at the hearing on defendant's motion, or in his post-trial motion, and we find this issue waived.

The evidence credited by the circuit court established defendant was free to leave Area 3 before noon, was not arrested until 1:30 p.m., and was not continuously interrogated. Defendant was given *Miranda* warnings prior to any interview conducted after his arrest; there was testimony that defendant understood his rights. According to the evidence presented by the State, defendant was not beaten or threatened by any police officers or by any assistant State's Attorneys. Defendant's confession came only after he was confronted with incriminating physical evidence.

We conclude that the circuit court's determination that defendant's confession was voluntary was not against the weight of the evidence. Accordingly, the circuit court's denial of defendant's motion to suppress based on his argument that his confession was not voluntary is affirmed.

## II. Admissibility as Substantive Evidence Under Section 115—10.1 of Grand Jury Testimony of a Witness Who, Although Present at Trial, Refuses to Testify Based on His Fifth Amendment Privilege Not to Incriminate Himself

Leslie Bea, brother-in-law of the mother of the victims and fiance of Gloria Stewart, sister of defendant, took the witness stand in the prosecution's case in chief. After being sworn, and before the prosecution asked its first question, Mr. Bea asked, "Can I have a lawyer?" The prosecution suggested the court allow for a break in the proceedings, and the jury was excused.

The circuit court appointed Mr. Salvatore Marzullo to interview Mr. Bea. After a recess, the jury came back to the courtroom. The circuit court introduced Mr. Marzullo to the jury, and explained that Mr. Marzullo had been appointed to represent Mr. Bea.

Mr. Bea testified his name was Leslie Bea. The prosecution then asked: "Mr. Bea, I am going to call your attention to the evening of March 3rd and the early morning hours of March 4th, 1984. Did you see the defendant in this case, Frank Redd, with blood on him at any time during—." Mr. Bea responded: "I refuse to answer that question on the grounds that it may incriminate me." The prosecution then stated: "Fine. Mr. Bea, I am going to call your attention to March 6, 1984. Did you testify before the Cook County Grand Jury on that day?" Mr. Bea testified, "Yes, I did."

The prosecution asked if Mr. Bea had been under oath, and Mr. Bea asserted his fifth amendment privilege. The

prosecution then asked: "Before the Cook County Grand Jury on March 6th, 1984, were you asked this question by Assistant State's Attorney Bastone: Q. Would you state your name?" Defendant objected to the reading of any kind of prior statement, and the circuit court overruled the objection based on "the new act, 83—1042 that became effective July 1st, 1984 codified as Section 115—10.1 of the Code of Criminal Procedure, Illinois Revised Statutes, Chapter 38, et cetera."

The prosecutor then repeated the questions posed to Mr. Bea, and the answers given by Mr. Bea, at the grand jury proceeding held on March 6, 1984. Each question and answer so read was prefaced by the prosecutor with the following: "Were you asked this question and did you give this answer?" After each such question, Mr. Bea stated: "I refuse to answer that question on the grounds that it may incriminate me." In this manner, the testimony given by Mr. Bea before the grand jury was placed before the jury as substantive evidence. The grand jury testimony, read by the prosecutor, contained the following:

"Q. What is your first name?

A. Leslie. My name is Leslie Bea. My last name is spelled B-e-a.

Q. Mr. Bea, you live at 6712 South Halsted?

A. Yes.

Q. Who do you live there with?

A. Gloria Stewart.

Q. Do you know Frank Redd?

A. Yes.

Q. How do you know Frank Redd?

A. That is Gloria's brother.

Q. Now, March 3, 1984, that was Saturday night that you had been at Gloria Stewart's mother's house?

A. Yes.

Q. That is Miss Earceaner Washington?

A. Right.

Q. You stayed there for the better part of the day and left and started walking back to your apartment, which is at 6712 South Halsted?

A. Yes.

Q. As you arrived at your apartment and were going into your apartment, Frank Redd and Ruby Bea came down and entered the apartment with you?

A. Yes.

Q. While you were there at the apartment, at that time, it was just Frank Redd, Ruby Bea, yourself, Gloria Stewart, and her son, Tyrone, is that right?

A. Yes.

Q. Frank told you he was going to leave for a while?

A. Yes.

Q. Did he leave?

A. Yes.

Q. How long was he gone the first time?

A. About five minutes.

Q. Did he come back?

A. Yes.

Q. When he came back, what did he have with him?

A. Some beer, forty ounces.

Q. How was he dressed?

A. He had a corduroy coat.

Q. What color pants? Did you see them?

A. I wasn't looking at the pants.

Q. When he came back with the beer, did Frank have a couple sips of the beer?

A. Yes.

Q. Then he put it on the table?

A. Yes.

Q. And then he left again?

A. Yes.

Q. This time he was gone longer?

A. Yes.

Q. How long was he gone?

A. About 25 or 30 minutes.

Q. About 25 or 30 minutes?

A. Yes.

Q. Then he came back to the apartment, did he not?

A. Yes, he did.

Q. When he came back to the apartment, did you notice a stain on his shirt?

A. Yes.

Q. What color was that stain?

A. It was red.

Q. Had that stain been there earlier when he had left?

A. No.

Q. While he was gone that 30 minutes, Miss Bea stayed in the apartment along with you and Gloria, did she not?

A. Yes.

Q. The radio had been playing?

A. Yes.

Q. It was rather loud, wasn't it?

A. Yes.

Q. You also noticed something dried on Frank's hands, didn't you?

A. Yes.

Q. What color was that?

A. It was dark.

Q. Frank went to the bathroom and used the bathroom?

A. Um-humm.

Q. When he came out from the bathroom, what did he tell his sister, Gloria?

A. He was going down to his mother's.

Q. And then he left the apartment?

A. Yes.

Q. Did he seem like he was drunk?

A. No."

During cross-examination, Mr. Bea continued to refuse to answer any of the questions put to him by defendant and continued to assert his fifth amendment privilege. Mr. Bea was asked by defense counsel if he was taking the fifth amendment because he "lied to the grand jury." He was also asked if he had told an assistant public defender and an investigator for the public defender's office on January 25, 1985, that the "State's Attorney's Office and the

police forced [him] to testify before the grand jury." Further, Mr. Bea was asked whether he told the investigator and the assistant public defender he wanted to tell the truth, but he had been told by the State's Attorney that he would be charged with perjury or obstructing justice if he testified differently at trial than at the grand jury.

Mr. Bea was asked: "Didn't you say that you were being forced and coerced and that you were afraid to go to jail and that you were afraid to tell the truth today?" Also, Mr. Bea was asked whether he had said to the investigator and the assistant public defender: "When I told the grand jury Frank Redd came back to my place with blood on him, it was not true"; "[t]he police forced me to say it"; and that Frank Redd did not, at any time, have blood on his clothes or person.

Defendant also asked Mr. Bea if he knew his blood type, whether he refused to testify truthfully about the homicide of his nieces, and whether he refused to testify about his part, if any, in the investigation or homicide of his nieces. To each and every question posed by defendant, Mr. Bea refused to answer based on his fifth amendment privilege.

The circuit court later clarified, outside the presence of the jury, its ruling allowing the grand jury testimony of Leslie Bea to be entered as substantive evidence pursuant to section 115—10.1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 115—10.1).

The circuit court explained that Mr. Marzullo, the attorney appointed to represent Leslie Bea, had informed him and all counsel that Mr. Bea had been advised to take the fifth amendment. The circuit court then explained it would allow the State to "read to [Leslie Bea] *** the various questions and answers." Additionally, the circuit court, "in the interest of fairness," would allow the defense to cross-examine Mr. Bea on whatever arose from the grand jury transcript and to question Mr. Bea about a statement

taken prior to trial whereby Mr. Bea "recanted" his statement to the grand jury. The circuit court then stated: "I interpreted [section 115—10.1] to mean that when someone takes the fifth amendment, that is the same as being inconsistent with his testimony at the hearing or trial or in fact as to the Grand Jury. And that was the reasoning behind my ruling."

Defendant argues that the circuit court erred in allowing Mr. Bea's prior testimony before the grand jury to be admitted as substantive evidence at defendant's trial pursuant to section 115—10.1. Substantive evidence is evidence which is "adduced for the purpose of proving a fact in issue, as opposed to evidence given for the purpose of discrediting a witness *** or of corroborating his testimony." (Black's Law Dictionary 1281 (5th ed. 1979).) Section 115—10.1 provides, in pertinent part:

> "In all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if:
>
> (a) the statement is inconsistent with his testimony at the hearing or trial, and
>
> (b) the witness is subject to cross-examination concerning the statement, and
>
> (c) the statement—
>
> (1) was made under oath at a trial, hearing, or other proceeding ***." (Ill. Rev. Stat. 1985, ch. 38, par. 115—10.1.)

Before our General Assembly enacted section 115—10.1, prior inconsistent statements were admissible only to impeach a witness. (*People v. Collins* (1971), 49 Ill. 2d 179.) In order for Mr. Bea's prior statements before the grand jury to be admitted substantively at defendant's trial, three requirements must be met: (1) Mr. Bea's statements before the grand jury must be inconsistent with Mr. Bea's testimony at defendant's trial; (2) Mr. Bea must be subject to cross-examination concerning his prior statements to the grand jury; and (3) the prior statements had to have been

made under oath. (Ill. Rev. Stat. 1985, ch. 38, pars. 115–10.1(a), (b),. (c)(1).) Defendant and the State agree that the third requirement has been met.

Defendant argues that the requirements of subsections (a) and (b) of section 115–10.1 were not met. Defendant argues that Mr. Bea's assertion of his fifth amendment privilege not to incriminate himself may not be considered to be inconsistent with anything and therefore may not be considered to be inconsistent with his prior statements before the grand jury. Additionally, defendant argues he was unable to effectively cross-examine Mr. Bea concerning his prior statements because Mr. Bea did not testify on direct examination.

The State argues that the circuit court was correct when it concluded that Mr. Bea's assertion of his fifth amendment privilege was inconsistent with his prior statements to the grand jury. The State urges this court to treat Mr. Bea's assertion of his constitutional privilege not to incriminate himself as a memory lapse. A professed memory lapse by a witness at trial concerning former testimony before a grand jury was found to be inconsistent with the former testimony in *United States v. DiCaro* (7th Cir. 1985), 772 F.2d 1314, and *People v. Flores* (1989), 128 Ill. 2d 66. Further, the State argues that defendant was not denied his right to confront Mr. Bea, because "[t]he trial court *** allowed a procedure where defense counsel was able in actuality to cross-examine Leslie despite Leslie's assertion of his fifth amendment privilege."

### A. Assertion of the Fifth Amendment Privilege

The fifth amendment provides, in part: "No person *** shall be compelled in any criminal case to be a witness against himself ***." (U.S. Const., amend. V; see also Ill. Const. 1970, art. I, §10.) The privilege, "which is available in any proceeding, guards against the compulsory disclosure of facts tending to establish criminal liability." (*People*

*ex rel. Keith v. Keith* (1967), 38 Ill. 2d 405, 410.) A witness in a criminal case has the privilege to refuse to answer questions which tend to incriminate him. The protection secured by the fifth amendment is confined, however, to those instances where the witness has reasonable cause to believe he might subject himself to prosecution if he answers. *Mason v. United States* (1917), 244 U.S. 362, 61 L. Ed. 1198, 37 S. Ct. 621; *People v. Baker* (1988), 123 Ill. 2d 233, 243-44; *People v. Katsigiannis* (1988), 171 Ill. App. 3d 1090, 1101; *People v. Thornton* (1983), 120 Ill. App. 3d 983, 986; *People v. McLaren* (1979), 77 Ill. App. 3d 368, 373.

The privilege against self-incrimination does not exist where there are no reasonable grounds to fear self-incrimination. (*In re Zisook* (1981), 88 Ill. 2d 321, 331.) Neither an unreasonable fear of self-incrimination nor a mere reluctance to testify is a ground for claiming the privilege. (*Zisook*, 88 Ill. 2d at 331.) Furthermore, the mere "say-so" of a witness "does not of itself establish the hazard of incrimination." (*Hoffman v. United States* (1951), 341 U.S. 479, 486, 95 L. Ed. 1118, 1124, 71 S. Ct. 814, 818.) Once a witness asserts his fifth amendment privilege not to incriminate himself, then "it is for the circuit court to determine if under the particular facts there is a real danger of incrimination." *Baker*, 123 Ill. 2d at 244; *Hoffman*, 341 U.S. at 486, 95 L. Ed. at 1124, 71 S. Ct. at 818; *Rogers v. United States* (1951), 340 U.S. 367, 95 L. Ed. 344, 71 S. Ct. 438; *Zisook*, 88 Ill. 2d at 332; *People v. Prater* (1987), 158 Ill. App. 3d 330, 337; *Thornton*, 120 Ill. App. 3d at 986.

The witness is not required to prove that the answer to a particular question would necessarily subject him to prosecution. As the Supreme Court stated in *Hoffman*:

"[I]f the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be

compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.' " (*Hoffman*, 341 U.S. at 486-87, 95 L. Ed. at 1124, 71 S. Ct. at 818.)

This court in *People v. Schultz* (1942), 380 Ill. 539, 544, stated:

"[I]t must appear from the circumstances of the case and the nature of the evidence which the witness is called to give, that there is a reasonable ground to apprehend danger to the witness from his being compelled to answer." *Schultz*, 380 Ill. at 544.

There is nothing in the record before this court to indicate the circuit court determined that Mr. Bea had reasonable grounds to fear incriminating himself if he were to answer the questions put to him by the State or defendant. The State informs this court that the circuit court, in an off-the-record discussion, attempted to ascertain the basis of Mr. Bea's assertion of the privilege. According to the State, Mr. Bea was fully aware of his grand jury testimony and asserted his fifth amendment privilege solely in order not to implicate defendant. The State asserts that this was "obviously considered by the trial court" in its off-the-record attempt to ascertain the basis of Mr. Bea's assertion of the privilege.

Initially, we note that if the circuit court had actually made a determination on the record that Mr. Bea was asserting the fifth amendment privilege solely in order not to implicate defendant, then allowing Mr. Bea to refuse to answer questions based on his fifth amendment privilege would have been an abuse of discretion. As has been ex-

plained, the assertion of the privilege may not be based solely on the "say-so" of the witness and mere reluctance to testify is not a basis for the successful assertion of the privilege. (*Hoffman*, 341 U.S. at 486, 95 L. Ed. at 1124, 71 S. Ct. at 818; *Zisook*, 88 Ill. 2d at 331.) It is for the circuit court, and not the witness, "to determine if under the particular facts there is a real danger of incrimination." *Baker*, 123 Ill. 2d at 244; *Hoffman*, 341 U.S. at 486, 95 L. Ed. at 1124, 71 S. Ct. at 818; *Zisook*, 88 Ill. 2d at 332.

It is not possible for this court to review an alleged off-the-record attempt by the circuit court to ascertain the basis of Mr. Bea's assertion of his constitutional privilege not to incriminate himself. Both defendant and the State provide this court with alternative speculations as to why Mr. Bea might have asserted his fifth amendment privilege. Regardless of whether any of these speculations are correct, the fact is that Mr. Bea was allowed to assert his fifth amendment privilege not to incriminate himself.

It appears from the fact Mr. Bea was permitted to refuse to testify based on the privilege that the circuit court determined reasonable grounds did exist for Mr. Bea to fear incriminating himself. From this conclusion, the circuit court then made the determination that refusal to testify on the ground that Mr. Bea had reasonable grounds to fear incriminating himself was inconsistent with his prior testimony before the grand jury.

We conclude it was error for the circuit court to construe Mr. Bea's assertion of the privilege as being inconsistent with his out-of-court statements to the grand jury. We also conclude Mr. Bea was not subject to effective cross-examination when he refused to answer any questions put to him by either the prosecution or the defense.

*B. Applicability of Section 115—10.1*

The State would have this court treat the assertion of the fifth amendment privilege as a memory loss. Federal

Rule of Evidence 801(d)(1)(A) (Fed. R. Evid. 801(d)(1)(A)) is similar to our section 115—10.1. Both provide for the substantive admission into evidence of prior inconsistent statements at trial when the declarant is subject to cross-examination concerning the prior statements. Rule 801(d)(1)(A) provides:

"A statement is not hearsay if—

\*\*\*

[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is \*\*\* inconsistent with his testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition \*\*\*." Fed. R. Evid. 801(d)(1)(A).

In *United States v. DiCaro* (7th Cir. 1985), 772 F.2d 1314, a witness who had testified in a grand jury proceeding professed a memory loss concerning the subject matter of his grand jury testimony at defendant's trial. The *DiCaro* court stated: " '[W]e do not read the word "inconsistent" in Rule 801(d)(1)(A) to include only statements diametrically opposed or logically incompatible' " and concluded " '[p]articularly in a case of manifest reluctance to testify ... "if a witness has testified to [certain] facts before a grand jury and forgets ... them at trial, his grand jury testimony ... falls squarely within Rule 801(d)(1)(A)." ' " *DiCaro*, 772 F.2d at 1321.

This court, in *Flores*, found the requirement of inconsistency of subsection (b) of section 115—10.1 to be met when a witness professes a memory loss at a trial concerning prior testimony before a grand jury. (*Flores*, 128 Ill. 2d at 88.) The witness testified at defendant's trial under a grant of immunity after having made known his intention to exercise his fifth amendment right to remain silent. On direct examination, the witness stated he could not recall having testified before the grand jury. The witness had his recollection refreshed by a transcript of his grand jury testi-

mony and acknowledged it contained an accurate description of his testimony before the grand jury. This court held in *Flores* the determination as to whether a witness' prior testimony is inconsistent with his present testimony is within the sound discretion of the circuit court. (*Flores*, 128 Ill. 2d at 87-88.) We also noted that the prior testimony of a witness does not have to "directly contradict testimony given at trial to be considered inconsistent within the meaning of that term set out in section 115–10.1." *Flores*, 128 Ill. 2d at 87.

We conclude the assertion of the fifth amendment privilege may not be treated as a memory loss for purposes of satisfying the requirement of inconsistency in section 115–10.1(a). When a witness is permitted to assert the privilege not to incriminate himself, he is not claiming to be unable to recollect prior affirmations of asserted facts. The witness is not asserting a "gap in [his] recollection concerning the content of a prior statement." (*Flores*, 128 Ill. 2d at 88.) The witness is asserting only that he believes the answers to questions posed may tend to incriminate him. The circuit court erred in holding Mr. Bea's assertion of his fifth amendment privilege to be inconsistent with his prior testimony.

The assertion by Mr. Bea of his fifth amendment privilege also prevented defendant an opportunity to cross-examine Mr. Bea in any meaningful manner. The requirement of subsection (b) of section 115–10.1 that Mr. Bea be subject to cross-examination was not met when Mr. Bea refused to testify on direct examination or on cross-examination.

The court in *DiCaro* addressed the question of whether a witness was subject to cross-examination within Rule 801(d)(1)(A) concerning a prior statement where a witness, although present and testifying at trial, claimed no recollection of either the underlying events described in the witness' prior testimony or the giving of the testimony itself.

The court concluded the cross-examination requirement of Rule 801(d)(1)(A) was met, relying on the combination of two factors. First, the witness took the stand and was actually questioned extensively by both the prosecution and defense. Second, defense counsel was able to severely impeach the witness' credibility with numerous statements the witness had made in prior Federal and State court hearings. (*DiCaro*, 772 F.2d at 1324-25.) In discussing the requirement of Rule 801(d)(1)(A) that the witness be subject to cross-examination concerning the statement, the *DiCaro* court stated:

> "[I]t is not enough that the declarant is subject to cross-examination in some general sense: he must be subject to questioning that in some way relates to the prior statement itself. *** [T]he legislative history [of the Rule] suggests that this cross-examination requirement played an important role in the adoption of the Rule. [Citations.] *** As the Senate Judiciary Committee stated in a report rejecting the House of Representatives' addition of a requirement that the prior statement must have been cross-examinable at the time it was originally made, a requirement that was deleted in the Rule as ultimately adopted, 'the requirement ... appears unnecessary since this rule comes into play only when the witness testifies in the present trial ... and can explain an earlier position and be cross-examined as to both.' " *DiCaro*, 772 F.2d at 1323.

The *DiCaro* court was careful to "avoid a construction [of the requirement that a witness be subject to cross-examination concerning the statement] that would render the requirement effectively meaningless." (*DiCaro*, 772 F.2d at 1323.) Additionally, the court noted:

> " 'Rule 801(d)(1)(A)'s cross-examination requirement should not be viewed as an empty formalism which can be satisfied by the mere fact that the witness is present and can be required to sit still long enough for questions to be put.' " *DiCaro*, 772 F.2d at 1323, quoting 4 D. Louisell & C. Mueller, Federal Evidence §419, at 181 (1980).

In *Flores*, the defendant argued that the witness was not subject to cross-examination as to his grand jury testimony due to the witness' professed memory loss. In concluding the trial court did not err in admitting the witness' grand jury testimony, this court noted that in *United States v. Owens* (1988), 484 U.S. 554, 98 L. Ed. 2d 951, 108 S. Ct. 838, the Supreme Court held that "the confrontation clause of the sixth amendment is not violated by the admission of testimony concerning a prior, out-of-court identification when the identifying witness is unable, because of memory loss, to explain the basis for the identification." (*Flores*, 128 Ill. 2d at 89.) The court in *Flores* rejected the defendant's argument that "a gap in the witness' recollection concerning the content of a prior statement" necessarily precludes an opportunity for effective cross-examination. (*Flores*, 128 Ill. 2d at 88.) As long as the declarant is actually testifying as a witness and is subject to full and effective cross-examination, then the confrontation clause is not violated by admitting the out-of-court statement of the declarant. *Flores*, 128 Ill. 2d at 88.

In *California v. Green* (1970), 399 U.S. 149, 26 L. Ed. 2d 489, 90 S. Ct. 1930, the Supreme Court stated:

> "[T]he Confrontation Clause does not require excluding from evidence the prior statements of a witness who concedes making the statements, and who may be asked to defend or otherwise explain the inconsistency between his prior and his present version of the events in question, thus opening himself to full cross-examination at trial as to both stories." *Green*, 399 U.S. at 164, 26 L. Ed. 2d at 501, 90 S. Ct. at 1938.

In a recent case concerning the admissibility of testimony which concerned a prior, out-of-court identification when the identifying witness was unable, because of memory loss, to explain the basis of the identification, the Supreme Court stated:

" '[T]he Confrontation Clause guarantees only "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." ' [Citations.] *** [O]pportunity is not denied when a witness testifies as to his current belief but is unable to recollect the reason for that belief. It is sufficient that the defendant has the opportunity to bring out such matters as the witness's bias, his lack of care and attentiveness, his poor eyesight, and even (what is often a prime objective of cross-examination, see 3A J. Wigmore, Evidence §995, pp. 931-932 (J. Chadbourn rev. 1970)) the very fact that he has a bad memory.

\* \* \*

*** Ordinarily a witness is regarded as 'subject to cross-examination' when he is placed on the stand, under oath, and responds willingly to questions. Just as with the constitutional prohibition, limitations on the scope of examination by the trial court or assertions of privilege by the witness may undermine the process to such a degree that meaningful cross-examination within the intent of the rule no longer exists. But that effect is not produced by the witness's assertion of memory loss—which, as discussed earlier, is often the very result sought to be produced by cross-examination, and can be effective in destroying the force of the prior statement." *Owens*, 484 U.S. at 558-61, 98 L. Ed. 2d at 957-59, 108 S. Ct. at 842-44.

In this case, Mr. Bea's prior testimony consisted of answers to leading questions posed to him by the State when he appeared before the grand jury. His answers to the questions posed to him before the grand jury placed defendant in Gloria Stewart's apartment directly below Ruby Bea's apartment around the time when the two children were killed. His answers established that defendant was gone for a 25- to 30-minute period. His answers also established defendant had a red stain on his shirt and had something dark and dried on his hands when defendant returned after his 25- to 30-minute absence.

When Mr. Bea was on the witness stand, he did not "respond[ ] willingly to questions." (*Owens*, 484 U.S. at 561, 98 L. Ed. 2d at 959, 108 S. Ct. at 844.) Mr. Bea neither admitted nor denied the content of his testimony before the grand jury. He was not in a position where he " '[could] explain an earlier position and be cross-examined as to both' " his present and earlier positions. (*DiCaro*, 772 F.2d at 1323.) Mr. Bea did not acknowledge his grand jury testimony "contained an accurate description of his grand jury testimony" (*Flores*, 128 Ill. 2d at 79) and could not "be asked to defend or otherwise explain the inconsistency between his prior and his present version of the events in question, thus opening himself to full cross-examination at trial as to both stories." *Green*, 399 U.S. at 164, 26 L. Ed. 2d at 501, 90 S. Ct. at 1938.

In neither *DiCaro* nor *Flores* did the witness refuse to testify to each and every question posed by either the State or the defense. In this case, Mr. Bea's "assertions of privilege *** undermine[d] the process to such a degree that meaningful cross-examination within the intent of the rule no longer exist[ed]." (*Owens*, 484 U.S. at 562, 98 L. Ed. 2d at 959, 108 S. Ct. at 844.) The "mere fact" that Mr. Bea was present and sat "still long enough for questions to be put" to him simply does not substitute for effective cross-examination within the meaning of subsection (b) of section 115—10.1. *DiCaro*, 772 F.2d at 1323; *Flores*, 128 Ill. 2d at 90.

The State urges this court to incorporate Federal Rule of Evidence 804(b)(5) (Fed. R. Evid. 804(b)(5)) into the law of this State. Rule 804(b) is concerned with exceptions to the hearsay rule for statements made by a declarant who is "unavailable" for trial. Unavailability under Rule 804(b)(1) includes situations where the declarant is exempted by a ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement. Also, if a declarant refuses to testify despite a court

order to do so, the declarant is deemed unavailable. Federal Rule of Evidence 804(b)(5) is known as the "residual exception" to the hearsay rule and provides:

"(b) *Hearsay exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\* \* \*

(5) *Other exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, [his] intention to offer the statement and the particulars of it, including the name and address of the declarant." Fed. R. Evid. 804(b)(5).

The State argues that Mr. Bea was "unavailable" as a witness because he asserted his fifth amendment privilege not to incriminate himself. Therefore, according to the State, Mr. Bea's grand jury testimony should be found to have been properly admitted since it contained "circumstantial guarantees of trustworthiness."

We decline to adopt the residual exception to the hearsay rule set out in Rule 804(b)(5). Our General Assembly has made a determination that prior inconsistent statements may be admitted as substantive evidence only when the requirements of section 115—10.1 are met.

We are unwilling to judicially amend section 115—10.1 to include a catch-all "residual exception" to the hearsay rule. If a prior inconsistent statement is to be admitted in Illinois in a criminal trial as substantive evidence against a

defendant, the statement must meet the requirements set out by the General Assembly in section 115—10.1. If the prior statement fails to meet these requirements, it is not admissible as substantive evidence.

It was reversible error to allow Mr. Bea's out-of-court statements, which were read verbatim by the State during its case in chief, to be used as substantive evidence against defendant. The requirements of subsections (a) and (b) of section 115—10.1 were not met: Mr. Bea's assertion of his fifth amendment privilege may not be considered inconsistent with his prior testimony; Mr. Bea was not subject to cross-examination in any meaningful way when he refused to testify at defendant's trial.

We note that, on retrial, if Mr. Bea again refuses to testify based on his fifth amendment privilege not to incriminate himself, there must be reasonable grounds for him to fear incriminating himself. The determination whether reasonable grounds exist for a witness to fear incriminating himself is for the circuit court to make, and not Mr. Bea. (*Zisook*, 88 Ill. 2d at 332.) If no reasonable grounds exist, a witness is not allowed to refuse to testify; mere reluctance to testify is not a valid ground for the assertion of the fifth amendment privilege. *Zisook*, 88 Ill. 2d at 331.

Furthermore, we note that when a witness is permitted to assert the fifth amendment privilege not to incriminate himself, the State has available to it the option of extending immunity to the witness under section 106—1 of the Code of Criminal Procedure (Ill. Rev. Stat. 1987, ch. 38, par. 106—1). If a witness has immunity from prosecution, there are no reasonable grounds for the witness to fear incriminating himself and the witness should not be allowed to refuse to testify based on the fifth amendment privilege. Although we reverse defendant's convictions and remand for a new trial, we shall consider other alleged errors which might recur.

## III. Other Issues

### A. *Impeachment of a Witness Who Asserts the Fifth Amendment Privilege Not to Incriminate Himself*

When the State finished asking Mr. Bea questions pertaining to his grand jury testimony, it asked three questions concerning a statement allegedly made by Mr. Bea to Percy Hamilton, a neighbor, soon after the victims were found. The State asked:

"Q. Just a couple of more questions, Mr. Bea. On March 4, 1984, between 2:30 and 3:30 in the morning, were you in the apartment of Percy Hamilton at 6712 South Halsted on the second floor?

\*\*\*

Q. Did Percy Hamilton ask you who could have done something like this?

\*\*\*

Q. Did you tell Percy you didn't know, but you had seen Frank earlier that night with blood on his hands and his clothes?"

Mr. Bea neither admitted nor denied making the statement; rather he asserted his fifth amendment privilege to refuse to answer on the grounds that it might incriminate him.

The State called Percy Hamilton to testify concerning the statements allegedly made to him by Mr. Bea. Defendant's objection to this was overruled on the grounds that Percy Hamilton's testimony was offered to impeach Mr. Bea. The following exchange took place between the prosecutor and Percy Hamilton:

"Q. Mr. Hamilton, I am going to call your attention to March 4, 1984 between the hours of 2:30 and 3:00 o'clock in the morning. Were you on the second floor apartment at 6712 South Halsted at that time?

A. Yes, sir.

Q. At that time in your living room did you have a conversation with Leslie Bea?

A. Yes, sir.

Q. Was there anybody else present besides you and Mr. Bea?

A. No, sir, not in the immediate room.

Q. At that time did you ask Mr. Bea who could have done something like this?

A. Yes, I did.

Q. And did he say he didn't know, but he had seen Frank earlier that night with blood on his hands and clothes?

A. That's correct, sir."

The State also called Detective Foley. Detective Foley testified he had a conversation with Mr. Bea on March 4, 1984, at approximately 11:30 a.m. at Area 3 headquarters. Detective Foley testified he told Mr. Bea that there was a discrepancy between Mr. Bea's account of events and Ruby Bea's account of events. Over defendant's objections, the State was allowed to question Detective Foley about statements which Ruby Bea had allegedly made to another officer. The State also questioned Detective Foley about what he had told Mr. Bea that Ruby Bea had said. The State argued its questioning was proper "in order to perfect the impeachment that we have here."

Detective Foley then testified that after confronting Mr. Bea with these discrepancies, Mr. Bea became visibly shaken, started to cry, and blurted out that defendant had returned to the apartment and had blood on him. Further, Detective Foley testified that Mr. Bea had told him that Mr. Bea lied to police originally about his account of events because he was afraid of defendant doing harm to himself and his family.

The State argues it was proper for the circuit court to allow it to impeach Mr. Bea by proof that he made statements out of court contradicting his in-court testimony. We do not agree. The purpose of impeaching evidence is to de-

stroy the credibility of a witness, not to establish the truth of the impeaching evidence. *People v. Bradford* (1985), 106 Ill. 2d 492, 499.

A witness who does nothing but assert the fifth amendment privilege against self-incrimination is not asserting anything other than that he believes he has reasonable grounds to fear incriminating himself. The only credibility issue under the facts of this case concerns whether or not Mr. Bea was being truthful in asserting he had reasonable grounds to fear incriminating himself. This issue was for the circuit court, and not the jury, to make; the circuit court, in allowing Mr. Bea to assert the privilege, resolved that issue in favor of Mr. Bea. Since Mr. Bea did not testify, it was error to allow him to be impeached by prior statements allegedly made by him concerning defendant to Percy Hamilton and Detective Foley.

We do not agree with the State that Percy Hamilton's or Detective Foley's testimony was proper to rebut Mr. Bea's allegations of police coercion brought out by defense counsel on cross-examination of Mr. Bea. Mr. Bea never testified about police coercion, and the questions of defense counsel, unanswered by Mr. Bea, are not substantive evidence. Neither do we agree with the State that Detective Foley's testimony was proper to explain the investigative procedure in this case. It is true that statements which would be hearsay if offered for the truth of the matter asserted may be admissible if offered for the limited purpose of explaining investigative procedure. (*People v. Jones* (1983), 114 Ill. App. 3d 576, 589.) In this case, however, Detective Foley's testimony was not offered to explain investigative procedures, but was offered only to impeach Mr. Bea.

On this record and under these circumstances, the testimony of Percy Hamilton concerning statements allegedly made by Mr. Bea to him, and the testimony of Detective

Foley concerning statements allegedly made by Mr. Bea to him, were not proper impeachment.

The State argues that if the substantive use of Mr. Bea's out-of-court statements to the grand jury is considered error, the error should be considered harmless. Additionally, if the "impeachment" of Mr. Bea by the testimony of Percy Hamilton and Detective Foley is considered error, the State argues the error is harmless. We do not agree.

The determination of harmless error must be analyzed on the particular facts of each case, considering the trial record as a whole. (*United States v. Hastings* (1983), 461 U.S. 499, 508, 76 L. Ed. 2d 96, 105, 103 S. Ct. 1974, 1980.) Mr. Bea, sitting in the witness chair, refused to testify. The State was permitted to use his out-of-court statement in front of the grand jury, which placed defendant directly below the scene of the murders with blood on his hands and clothes, as substantive evidence against defendant. The State was then permitted to impeach Mr. Bea with alleged prior statements to Percy Hamilton which placed defendant directly below the scene of the murders with blood on his hands and clothes. Furthermore, the State referred to Leslie Bea's testimony during both closing argument and rebuttal. The State also was permitted to impeach Mr. Bea with alleged prior statements to Detective Foley which placed defendant directly below the scene of the murders with blood on his hands and clothes. This court is unable to conclude that the prejudicial impact to defendant of repeated references to statements placing defendant directly below the scene of the murders with blood on his hands and clothes made by a witness who was not subject to cross-examination concerning the statements was harmless error.

## B. Photographs

The circuit court allowed the State to introduce eight blown-up photographs of the victims to be admitted into

evidence during the guilt phase of defendant's trial and given to the jury during deliberations. These eight photographs have not been included in the record before this court. We are informed that all the photos but one, which depicts Robert Bea's shirt which was taken from Leola's neck, depict the victims at the crime scene.

The State argued to the circuit court that the pictures would corroborate the condition of the victims at the time they were found and would corroborate the testimony concerning their injuries. The blown-up photos were 11 by 14 inches, the regular pictures were 3 by 5 inches. Defendant argues that the blown-up photos were designed to excite the passions of the jury.

The circuit court allowed the State to use the blown-up photos in the trial in order to aid the jury in understanding the way in which the crime occurred and the injuries sustained by the victims. After the State's case in chief, and during a conference concerning which photos would be admitted into evidence and would go to the jury, defendant objected to two of the pictures on the grounds that the photos were blowups designed only to excite the passions of the jury. Defendant also objected to two of the photos on the grounds that an improper foundation was laid. Defendant objected to three of the photos on the grounds that the photos were cumulative. Defendant now argues that the pictures which depicted the victims' conditions were not probative of any fact in issue because the manner and the cause of death were not at issue in defendant's case.

Since these exhibits are not included in the record, we are unable to review the decision reached by the circuit court. The general rule regarding admissibility of photographs depicting the condition of the decedent was set forth in *People v. Jenko* (1951), 410 Ill. 478:

"Evidence having a natural tendency to establish the facts in controversy should be admitted. A party cannot have

competent evidence excluded merely because it might arouse feelings of horror and indignation in the jury. Any testimony concerning the details of a murder or other violent crime may have such tendencies, but manifestly this could not suffice to render it incompetent. Of course, where spectacular exhibits having little probative value are offered for the principal purpose of arousing prejudicial emotions they should be promptly excluded. But questions relating to the character of the evidence offered, and the manner and extent of its presentation, are largely within the discretion of the trial judge, and the exercise of that discretion will not be interfered with unless there has been an abuse to the prejudice of the defendant." (*Jenko*, 410 Ill. at 482.)

It is the function of the circuit court to weigh the probative value and potential prejudicial effect of such evidence, and the decision of the court will not be reversed absent an abuse of discretion. (*People v. Greer* (1980), 79 Ill. 2d 103, 117.) In *People v. King* (1963), 29 Ill. 2d 150, 154, the court stated:

"All evidence concerning 'the physical facts and circumstances showing a killing are admissible in evidence as tending to throw light on the transaction and to reveal the nature' of the crime. [Citation.] Also all facts of the crime which show the aggravated nature of the offense are relevant to the punishment to be set by the jury." (*King*, 29 Ill. 2d at 154.)

On remand, if the State seeks to admit the photographs complained of by defendant, the circuit court shall exercise its discretion in accordance with the principles discussed above.

During the aggravation and mitigation phases of the sentencing hearing, the circuit court allowed 11 blown-up photos of the victims' bodies which were taken at the morgue to be published to the jury. Defendant argues that this was error because the photographs were being used solely to excite the passions of the jury. The circuit court allowed the photographs to be published because it found

the photographs to be relevant at the sentencing phase to the issue of aggravation. The circuit court stated "that it was relevant in aggravation for this jury to consider the trauma or potential trauma that was visited upon the two deceased girls."

These photos graphically depict the injuries sustained by the three- and five-year-old deceased children. The photographs establish the severity of the beating inflicted upon Aretha Bea, the degree of force which was used in strangling Leola Bea, and the brutal manner in which both children were raped. While defendant did not refute the cause of death of the two children, this did not preclude the State from presenting evidence which established the degree of force used against the victims and the manner in which they were strangled. (*People v. Speck* (1968), 41 Ill. 2d 177, 203-04; *People v. Kolep* (1963), 29 Ill. 2d 116, 124.) We cannot conclude the admission of these photographs was an abuse of discretion.

### C. Denial of Defendant's Motion for Mistrial

Prior to trial, the defense moved *in limine* for an order "[p]reventing the State from presenting evidence of any alleged prior sexual misconduct by defendant." Defense counsel had been concerned about an allegation in a police report regarding defendant's prior sexual misconduct with his sister, Gloria Stewart. The State informed the circuit court that it had instructed its witnesses not to go into this matter. The circuit court granted defendant's motion.

Detective Foley testified for the State concerning the murder investigation of Leola and Aretha Bea on March 4, 1984. During cross-examination, Detective Foley was questioned extensively concerning the circumstances surrounding the arrest of defendant.

On redirect examination, the State asked Detective Foley about the basis of his decision not to allow defendant to leave the police station. Detective Foley testified he

made the decision based on discrepancies between the account of Leslie Bea, Ruby Bea and Gloria Stewart concerning what had happened and defendant's account of what had happened.

When Detective Foley started to testify as to what Leslie Bea, Gloria Stewart and Ruby Bea had said, defense counsel objected. The objection was overruled because the circuit court considered the area of Detective Foley's decision not to allow defendant to leave the police station to have been opened up by the defense during cross-examination. Detective Foley then testified that Gloria Stewart and Leslie Bea said defendant returned to the apartment after an absence and had blood on his hands and pants. Detective Foley, who had not interviewed Ruby Bea, testified that Ruby Bea had followed defendant out of Gloria Stewart's apartment when defendant left the second time to lock the door on the first floor. According to Detective Foley, Ruby Bea had told another police officer she did not see defendant when she looked down the stairs, and that defendant would not have been able to get down the stairs and out the door during the time in which she had followed him.

The State then asked Detective Foley, "What additional information did you have from Gloria Stewart?" Detective Foley responded, "Gloria Stewart had said, first of all, she was in fear for her safety, and he [defendant] had raped her previously when she was 9 and 12 years old." It was in response to Detective Foley's answer asserting Gloria Stewart had told a police officer her brother had raped her that defendant objected and moved for a mistrial.

The State argued that defense counsel's cross-examination of Detective Foley as to when and why defendant was placed under arrest opened the door to this information by Detective Foley. Defense counsel argued that the statement concerning the alleged rape of Gloria Stewart by defendant

violated the order *in limine* and was prejudicial and irrelevant.

The circuit court concluded the area of when and why Detective Foley placed defendant under arrest was opened up during the extensive cross-examination of Detective Foley by defense counsel. The court also found the cross-examination placed Detective Foley's credibility in issue. The court did not consider the violation of the order *in limine* intentional and denied defendant's motion for mistrial.

The circuit court offered to make a curative statement to the jury informing them they were not to "concern themselves with a statement regarding what Ms. Stewart might have said regarding a purported rape of her by her brother." Defense counsel declined the offer.

It is within the discretion of the circuit court to determine the propriety of declaring a mistrial. (*People v. Hall* (1986), 114 Ill. 2d 376, 405.) A mistrial should generally be declared only as the result of some occurrence at trial of such character and magnitude that the party seeking it is deprived of his right to a fair trial. (*Benuska v. Dahl* (1980), 87 Ill. App. 3d 911, 913.) Since we reverse on other grounds, we need not decide if the statement of Detective Foley concerning Gloria Stewart's alleged rape by her brother, standing alone, would be so prejudicial as to have made it an abuse of discretion for the circuit court to deny defendant's motion for mistrial.

We note that immediately before the State asked Detective Foley what additional information Gloria Stewart had given him, the State had asked Detective Foley to tell the jury why he had made the decision not to allow defendant to leave the police station. As part of his answer, Detective Foley testified as to what Gloria Stewart had told him.

On remand, defendant should be entitled to an order limiting the State from introducing evidence concerning the alleged rape of Gloria Stewart by defendant. Should

the State consider it necessary to specifically ask Detective Foley, or another witness, for information provided by Gloria Stewart in addition to the discrepancy between her account and defendant's account of the events of March 3, the State should make clear to the witness, either before the witness testifies or outside the presence of the jury, that it is not seeking information about any alleged prior sexual misconduct of defendant.

### D. Impeachment by Prior Conviction

Defendant made a motion *in limine* seeking to bar the use of his prior convictions for rape and attempted murder as impeachment evidence. In the alternative, the defense asked the circuit court to delete the subject matter of the prior convictions and replace it with the word "felony." The circuit court denied the motion.

In *People v. Montgomery* (1971), 47 Ill. 2d 510, this court discussed the version of Rule 609 of the Federal Rules of Evidence relating to impeachment by evidence of conviction of a crime which had been proposed by the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States. It was the opinion of the court in *Montgomery* that the provisions of the rule should govern future cases. (*Montgomery*, 47 Ill. 2d at 519.) The proposed rule set out in *Montgomery* reads in part:

" 'Rule 609. Impeachment by Evidence of Conviction of Crime

(a) General Rule. For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime, except on a plea of *nolo contendere*, is admissible but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, or (2) involved dishonesty or false statement regardless of the punishment unless (3) in either case, the judge determines that the probative value of the evidence of

the crime is substantially outweighed by the danger of unfair prejudice.' " (*Montgomery*, 47 Ill. 2d at 516.)

Factors which are normally considered by the circuit court in exercising its discretion include the nature of the crime, nearness or remoteness of the crime, the subsequent career of the person, and whether the crime was similar to the one charged. *Montgomery*, 47 Ill. 2d at 518.

The record does not indicate that the circuit court performed the balancing test required by *Montgomery*: whether the probative value of the rape and attempted murder convictions was outweighed by the danger of unfair prejudice to defendant. The State argues that if the circuit court was aware of *Montgomery* and its provisions, it must be assumed that the circuit court gave appropriate consideration to the relevant factors, and such consideration need not appear of record. The State cites *People v. Washington* (1973), 55 Ill. 2d 521, *People v. Graves* (1986), 142 Ill. App. 3d 885, and *People v. Hovanec* (1979), 76 Ill. App. 3d 401, as authority for this argument.

In *People v. Washington*, the trial judge, in determining it was proper to allow the defendant to be impeached by a prior conviction, was "cognizant of *Montgomery*, a then recent case, and *** quoted its provisions at length from the bench." (*Washington*, 55 Ill. 2d at 523.) The *Washington* court rejected the defendant's argument that the trial judge failed to consider any of the factors enumerated in *Montgomery* other than remoteness of the crime.

In *Washington*, it was apparent the judge was aware of the potential for prejudice in the admission of the prior conviction, as the judge commented on the necessity of a limiting instruction concerning the use of the impeaching conviction by the jury. Moreover, the State and defense argued whether the offense in question was contemplated by the rule. It was "clear from [the] record that the trial court in fact had an adequate basis upon which to exercise its sound discretion." *Washington*, 55 Ill. 2d at 524.

In *Graves*, the court noted that the record did not expressly indicate the trial judge applied the *Montgomery* balancing test; the court found, however, that the trial court "was well aware of the *Montgomery* provisions." *Graves*, 142 Ill. App. 3d at 898.

The court in *Hovanec* discussed the *Montgomery* case in the hearing on the admissibility of the defendant's prior conviction for impeachment purposes. "Since the court was aware of *Montgomery* and its provisions, it must be assumed that the judge gave appropriate consideration to the relevant factors and they need not appear of record." *Hovanec*, 76 Ill. App. 3d at 421.

In this case, defendant argued to the circuit court that the prior rape and attempted murder convictions are so similar to the charges defendant faced at trial that defendant could not get a fair trial. The State responded that defendant's case turned on credibility; the State argued to the circuit court that "the discretion you are given under *Montgomery* in order to know whether or not that [defendant's] conviction for the similar offense is also an aid in determining credibility and will not be reversed if in granting our motion using your discretion you allow us to use a similar offense." The circuit court then denied the motion. From the record, it appears the trial court understood its discretion under *Montgomery*, and properly denied defendant's motion.

## IV. Conclusion

For the reasons expressed in this opinion, we hold it was reversible error for the State to have been permitted to use the prior statements of its witness Leslie Bea as substantive evidence against defendant when the witness refused to testify at trial based on his fifth amendment privilege not to incriminate himself. The prior statements of the witness failed to meet the requirements of subsec-

tions (a) and (b) of section 115—10.1 and were inadmissible and prejudicial hearsay which denied defendant a fair trial.

Because of our disposition of this case, we need not consider the remaining issues alleged by defendant to have been error. Defendant's convictions are reversed and his sentences are vacated. We remand this cause to the circuit court of Cook County to be assigned for a new trial.

*Convictions reversed;*
*sentences vacated;*
*cause remanded.*

JUSTICE MILLER, specially concurring:

I agree with the majority that the trial court erred in admitting prosecution witness Leslie Bea's grand jury testimony as substantive evidence. My explanation for that conclusion is somewhat different from the majority's, however, and for that reason I write separately.

Section 115—10.1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 115—10.1) permits the substantive use of a trial witness' prior inconsistent statement, such as the grand jury testimony at issue here, "if (a) the statement is inconsistent with his testimony at *** trial, and (b) the witness is subject to cross-examination concerning the statement." The majority concludes that neither statutory requirement was satisfied in the present case and that the introduction of the witness' prior statement was therefore improper.

In determining that a witness' claim of the privilege against self-incrimination cannot be construed as being inconsistent with what the witness said on a prior occasion, the majority declares that in claiming the privilege the witness "is asserting only that he believes the answers to questions posed may tend to incriminate him." (135 Ill. 2d at 308.) The majority's conclusion on this issue leaves several points unanswered, however. First, it is not clear that a claim of privilege is a testimonial assertion at all. One

may question whether a witness who, like Leslie Bea, asserts the privilege against self-incrimination throughout his time on the witness stand has in fact provided any testimony against which a prior statement may be compared for purposes of determining consistency and inconsistency under the statute. Moreover, if a claim of the privilege against self-incrimination is to be viewed as a testimonial assertion, then perhaps we should also recognize that a witness who stands on the privilege may in fact believe that he is acting in a manner that is consistent with a prior inculpatory statement and inconsistent with a prior noninculpatory or exculpatory statement.

In any event, those matters need not be resolved in the present appeal, for exclusion of the grand jury testimony was required on a separate, independent ground. Of greater concern here is the question whether a witness who asserts the privilege against self-incrimination may be deemed to be subject to cross-examination concerning his prior statement. I agree with the majority that the cross-examination requirement was not satisfied in the instant case. Because the grand jury testimony was inadmissible on that ground alone, it is not necessary that we decide whether the inconsistency requirement was also met.

Section 115—10.1 is similar to Federal Rule of Evidence 801(d)(1)(A) (Fed. R. Evid. 801(d)(1)(A)), which excludes from the definition of hearsay certain prior statements of a declarant that are inconsistent with his current testimony. The Federal rule requires that the declarant testify at trial and be subject to cross-examination concerning the prior statement. According to one leading text, the rule is not applicable if the trial witness "claims a privilege so that direct examination or effective cross-examination is thwarted." 4 J. Weinstein & M. Berger, Weinstein's Evidence par. 801(d)(1)(A)(01), at 801—109 (1988).

In *United States v. Owens* (1988), 484 U.S. 554, 98 L. Ed. 2d 951, 108 S. Ct. 838, the Supreme Court considered

a related question. In that case a witness' memory was severely impaired as a result of a beating he incurred as a correctional counselor in a Federal prison. While recovering from his injuries, the victim identified the defendant as his attacker. At the defendant's trial, the victim testified to some of the circumstances of the assault but could not recall seeing the defendant. The victim was able to remember, however, his previous identification of the defendant. The Supreme Court held that the witness' inability at trial to recall the basis for his previous identification of the defendant did not violate the defendant's confrontation right. The Court also ruled that the prior identification was admissible under Federal Rule of Evidence 801(d)(1)(C), which excludes from the definition of hearsay a statement regarding an out-of-court identification. The Court held that the witness was subject to cross-examination concerning the prior identification, as required by Rule 801(d)(1). The Court explained:

"It seems to us that the more natural reading of 'subject to cross-examination concerning the statement' includes what was available here. Ordinarily a witness is regarded as 'subject to cross-examination' when he is placed on the stand, under oath, and responds willingly to questions. Just as with the constitutional prohibition, limitations on the scope of examination by the trial court or assertions of privilege by the witness may undermine the process to such a degree that meaningful cross-examination within the intent of the rule no longer exists. But that effect is not produced by the witness' assertion of memory loss—which, as discussed earlier, is often the very result sought to be produced by cross-examination, and can be effective in destroying the force of the prior statement. Rule 801(d)(1)(C), which specifies that the cross-examination need only 'concer[n] the statement,' does not on its face require more." 484 U.S. at 561-62, 98 L. Ed. 2d at 959, 108 S. Ct. at 844.

In contrast to the witness' memory loss in *Owens*, in the present case "assertions of privilege by the witness un-

dermine[d] the process to such a degree that meaningful cross-examination" did not occur. Apart from constitutional concerns (see *Douglas v. Alabama* (1965), 380 U.S. 415, 13 L. Ed. 2d 934, 85 S. Ct. 1074 (finding confrontation violation where witness, in response to questions regarding prior confession inculpating himself and defendant, claimed privilege against self-incrimination)), it thus appears that the trial court erred in allowing the introduction of the witness' prior statement as substantive evidence under section 115—10.1. See *United States v. Fiore* (2d Cir. 1971), 443 F.2d 112 (requirement of then-proposed Federal Rule of Evidence 801(d) that declarant testify at trial and be subject to cross-examination concerning statement not satisfied when declarant makes evident his refusal to testify); see also *United States v. Chapman* (11th Cir. 1989), 866 F.2d 1326, 1330 (wife rendered unavailable as witness by assertion of spousal privilege not to testify against husband); *United States ex rel. Thomas v. Cuyler* (3d Cir. 1977), 548 F.2d 460, 463 ("A witness who refuses to be sworn or to testify at all or one who, having been sworn, declines to testify on Fifth Amendment grounds, has not been thus made available for cross-examination").

It is unclear on the present record whether the witness could properly invoke his privilege against self-incrimination. As the majority opinion states, the privilege is not available simply because the witness wishes to claim it. Thus, on remand, if the witness again attempts to assert the privilege against self-incrimination, it will become necessary for the trial judge to determine whether the privilege is in fact available in these circumstances. It may be noted that the hearsay exception allowing the use of an unavailable declarant's former testimony is not applicable here, for the defendant had no opportunity to cross-examine the witness during his appearance before the grand jury. (See *People v. Horton* (1976), 65 Ill. 2d 413, 415-17; *People v. Wilkerson* (1984), 123 Ill. App. 3d 527, 534.) That

the witness' grand jury testimony "consisted of answers to leading questions posed to him by the State," as the majority observes (135 Ill. 2d at 311), does not, however, render the rule of section 115—10.1 any less applicable in a proper case.

JUSTICE STAMOS joins in this special concurrence.